Clayton HARRIS, Appellant,

v.

Peter M. DEVEAU, Appellee.

No. 312.

Supreme Court of Alaska.

Sept. 23, 1963.

———◆———

Roy H. Madsen, Kodiak, for appellant.

No appearance for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

AREND, Justice.

This case arose out of the claim of a seller of certain personal property that the buyer breached his oral contract to buy the property and the buyer's defense that he had rescinded the contract because the seller failed to perform his obligations thereunder.

Peter Deveau, plaintiff below, conducts an electronics, radio and radar business at

Kodiak. He also installs and repairs radar sets. About November 1, 1961, Clayton Harris, the defendant, ordered from the plaintiff a Model 1500 Ratheon radar set to be shipped via air freight from Ratheon Manufacturing Company at Seattle and to be installed on the defendant's commercial fishing boat at the agreed price of $5,040.24. Payment was to be made whenever the equipment was installed and operating satisfactorily. The set, which consisted primarily of an antenna and an indicator, arrived two weeks later and the plaintiff proceeded with the work of installation. The indicator proved to be defective and had to be returned to Seattle for corrections. In the meantime the plaintiff borrowed from a Mr. Dyson an identical indicator, except that it showed 815 hours of use, and installed it temporarily in place of the one sent back to Seattle.

With a radar set thus installed in his boat, the defendant left port to fish for crabs, it being understood between him and the plaintiff that, when the other indicator was returned from Seattle and installed in operative condition in the place of the borrowed instrument, the defendant would pay for the complete radar set. While out fishing the defendant encountered some heavy seas in which the pilothouse window of his boat was broken out. Salt water came through the broken window and so severely damaged the borrowed indicator that its owner, Dyson, refused to accept it back and required the plaintiff to replace it with a new one.

There is a conflict in the testimony of the parties as to what occurred between them when the defendant returned from his fishing trip. The plaintiff testified that, when he accosted the defendant about the damage to the borrowed indicator and asked him whether he was going to put in an insurance claim the defendant answered, "Well it isn't hurt that bad." At the same time he told the plaintiff to go ahead and install the new indicator which had been received back from Seattle. A day or two later, after the plaintiff had been able to determine the actual damage to the indicator and had informed the defendant that he was going to hold him liable for the damages, the defendant stated that he was not going through with the sale and told the plaintiff "to take it [the radar set] out." The defendant left the antenna at the shop of the plaintiff during a time when the latter was out.

The defendant, on the other hand, claimed that the heavy sea which broke the pilothouse window and caused the damage to Dyson's indicator was an act of God. The reason he gave for not making an insurance claim for adjustment on the borrowed indicator was as follows:

"Well it wasn't my indicator and when you have an indicator installed, when it's completely installed, you notify your insurance * * * but they had never completed installation—it wasn't officially—I didn't have a radar."

With respect to the plaintiff's claim that the defendant had refused to let him complete the installation of the radar set ordered from Seattle, the defendant testified that it was the plaintiff who refused to complete the installation, primarily because of a disagreement that arose between the parties over the effective range of the set. According to the defendant, the set was supposed to reach thirty-two miles but he was willing to let it be installed and pay for it if it would operate at only twenty-four miles; however, the plaintiff "thought that it only ought to do 18 or 20 miles" and refused to install the new indicator "or give me [the defendant] any kind of satisfaction so I didn't have any choice but to return the other part."

By way of rebuttal the plaintiff testified that he was eager to complete the installation so that he could collect the purchase price, but that the defendant wanted him to guarantee that the radar set would reach thirty-two miles. This he stated that he could not do because the thirty-two miles was an indicated range, not a guaranteed

range. Earlier on examination in chief, the plaintiff had testified that

"From the Kodiak Harbor with a 32-mile-range radar, or supposedly 32 mile range, you can only see targets about fourteen and a half miles away and if a radar is working in first-class shape you can see targets at fourteen and a half miles from Kodiak; and we saw targets at fourteen and a half miles and they were real intense; in other words, if the radars were only working a lukewarm, why you might see the targets and they would be faint but this had bright targets at fourteen and a half miles which is the maximum you can see from the boat harbor."

When asked on cross examination whether one might not assume that the radar set should function at thirty-two miles because the manufacturer's price list showed a "1954 G indicator 32 miles" the plaintiff answered:

"No because any prospective buyer we always explain to them that only under very ideal conditions will the radar ever see thirty-two miles."

The trial court, sitting without a jury, found for the plaintiff and awarded him damages in the sum of $1801.74 because of a breach by the defendant of the contract of sale and because of the injury he caused to the borrowed indicator "by permitting it to become saturated with salt water." The defendant has appealed from the decision against him and has specified three errors, which we shall consider in the order they are set forth in the brief.

First the defendant states that, since the plaintiff never complied with the requirement of the contract that he deliver and install in operating condition specific goods, it was error for the trial court to award him damages for breach of contract attributed to nonacceptance of the goods by the defendant. He appears to have grounded this specification of error upon the following provision of the Uniform Sales Act,[1] which was in effect in Alaska at the time of the dealings between the parties to this case:

"Rule 2. [Contract to sell specific goods.] Where there is a contract to sell specific goods and the seller is bound to do something to the goods, for the purpose of putting them into a deliverable state, the property does not pass until such thing be done."[2]

■ This rule, as we read it, postulates that the buyer do nothing to prevent the plaintiff from complying with his obligation under the contract. There was evidence, though contradicted by the defendant, that the defendant refused to let the plaintiff, through no fault of the latter, complete the delivery and installation of the radar set ordered from Seattle. It is evident from the decision of the trial court that it believed the plaintiff and considered that he had fulfilled his obligations under the contract, entitling him to damages because of the refusal of the defendant to pay for the radar set. We find no error on this point.

■ The defendant next contends that it was error for the trial court to award damages to the plaintiff for injury to the borrowed radar set since the issue of negligence was neither pleaded nor tried below. The defendant acknowledges the provisions of Civ.R. 15(b) that, when issues not raised in the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings and that failure to amend the pleadings to conform to the evidence does not affect the result of the trial of such issues. Furthermore, he admits that the radar equipment was damaged while in his possession by salt water pouring through the pilothouse window which was broken out by

1. Sections 29–1–1 through 29–1–189 AC LA 1949, as amended by SLA 1955, ch. 96. The Uniform Sales Act as of January 1, 1963, was replaced by the Uniform Commercial Code [AS 45.05.002–45.05.794].

2. Section 29–1–63, Rule 2, ACLA 1949.

heavy seas. Nevertheless, he insists that the issue of negligence on his part was never raised in the court below.

■ There is no doubt in our minds that both parties recognized the negligence issue involved in this case and that they treated it as an issue to be determined in the trial. At no time did the defendant object to testimony concerning the damage to the borrowed indicator and the demand made by the plaintiff upon the defendant that he make good the damages. In fact, the defendant himself disclaimed any fault on his part by asserting that the borrowed indicator was damaged through an act of God. We find that the negligence issue, though not pleaded, was tried by implied consent of the parties, and, therefore, the court did not err in treating it as an issue to be determined in the case.

As his final point the defendant urges that the court erred in awarding damages for the borrowed indicator because the evidence in this case established a bailment for the mutual benefit of the parties. Under that type of bailment, he says, the defendant as bailee is required to exercise only reasonable care, that is, such care as a man of ordinary prudence and discretion would use in reference to the subject of the bailment were it his own property and that he would not be answerable for a loss by inevitable accident or irresistible force. What the defendant seems to be saying is that the defendant as bailee was not liable for injury to the borrowed indicator be-cause the injury was due to an act of God over which he had no control

■ Regardless of the type of bailment and the degree of care required of the bailee, the trend of modern authorities is in support of the rule that in order to throw the duty of proceeding with actual proof of negligence upon a bailor who has made out a prima facie case by showing that the chattel involved was damaged or destroyed while in the possession of the bailee, the bailee must not only prove that the damage or loss occurred by reason of theft, fire or other cause beyond his control, but produce further evidence in explanation of the actual damage or loss which would indicate exercise of care on his part in the protection of the property. It is reasoned, and we think rightly so, that the bailee being in possession of the chattel is in a better position to explain the origin of the fire or the circumstances of the theft or other cause which would determine whether the loss or damage was due to negligence. He should disclose, to the extent that he is able, the manner in which the damage or loss occurred, the facts and circumstances attending such damage or loss and the precautions taken to prevent it.[3] This the defendant failed to do.[4] In other words, he failed to carry the burden of proceeding with the evidence after the plaintiff had established a prima facie case and therefore the trial court committed no error in awarding damages to the plaintiff for injury to the borrowed indicator.

Judgment affirmed.

---

3. Hopper's, Inc. v. Red Bank Airport, Inc., 15 N.J.Super. 349, 83 A.2d 457 (1951) ; Agricultural Ins. Co. v. Constantine, 144 Ohio St. 275, 58 N.E.2d 658, 663–665 (1944) ; National Fire Ins. Co. v. Mogan, 186 Or. 285, 206 P.2d 963, 965–967 (1949).

4. The burden of proof, of course, remained upon the plaintiff as bailor to prove by a preponderance of the evidence that the defendant as bailee was guilty of negligence or failure to exercise due care. See Agricultural Ins. Co. v. Constantine, supra note 3, 58 N.E.2d at 665.