Harold R. HERNING and George Horner, Appellants,

v.

Walter WIGGER, Appellee.

No. 519.

Supreme Court of Alaska.

Jan. 30, 1965.

3. Note 1, supra.

Warren A. Taylor, Fairbanks, for appellants.

William V. Boggess, Fairbanks, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

AREND, Justice.

This suit was instituted by Walter Wigger as plaintiff to enforce certain contractual obligations which he alleged the defendants Herning and Horner owed to him. Upon issue joined and trial had to the court, findings of fact and judgment were rendered in favor of the plaintiff, and the defendants have appealed, contending, among other things, that there was a failure of consideration from the plaintiff and that the parties mutually rescinded the contract which contained the obligations sued upon.

It appears from the trial court's findings that in August of 1957 the plaintiff, the defendant Herning and one Ringstad entered into an oral partnership agreement to mine on the Kugruk River near Candle, Alaska. Pursuant to the agreement, they contracted on August 31 with Mr. and Mrs. Paul Beshore to pay the latter $16,300 for a D8 tractor, an Allis Chalmers pump and certain mining rights on the Kugruk.

The partners had given the Beshores a promissory note in the sum of $5,430 as part payment for the property mentioned above; but they defaulted in the payment of the note and so on November 20, 1957, the plaintiff and the defendant Herning gave new notes to Mr. Beshore for the entire $16,300 purchase price and simultaneously received back from him a bill of sale to

the equipment, but not the land, covered by the contract of August 31.

One of the new notes was for $5,430. This note was paid on its due date, December 31, 1957, with money borrowed from the First National Bank of Fairbanks by the plaintiff, the defendant Herning and Ringstad on a promissory note to the bank for $5,400. Ringstad executed the note to the bank as an accommodation endorser only, because he had withdrawn from the partnership before the new notes to Beshore had been executed.

On July 31, 1959, the defendants Herning and Horner, by written agreement, purchased from the plaintiff one set of D8 tracks and the plaintiff's interest in Beshores' D8 tractor and pump for $11,000, plus a balance of about $1,000 then due to Mr. Beshore on one of the promissory notes given to him on November 20, 1957. This $11,000 represented the agreed price of the D8 tracks and the money paid by the plaintiff alone to Beshore for the D8 tractor and the pump.

Contrary to their agreement, the defendants failed and refused to pay the $11,000 owed to the plaintiff and likewise failed and refused to make the payment of approximately $1,000 still owing to Mr. Beshore, which latter obligation the plaintiff was required to pay and did pay in the sum of $1,026.

To induce the plaintiff to enter into the written agreement of July 31, 1959, the defendant Herning orally promised and agreed to be solely responsible for the payment of the $5,400 note to the bank. It was in reliance upon this promise of the defendant that the plaintiff entered into the agreement. But the plaintiff was required to and did pay the entire amount due on the note, which, with interest, totaled $6,373.96.

In addition to various admissions, denials and allegations set forth in their separate answers to the plaintiff's amended complaint in this action, the defendants pleaded affirmatively that in the fall of 1959 the parties had mutually rescinded their agreement of July 31, 1959.[1] The plaintiff testified that he had never repudiated the agreement; and the trial court made a specific finding "That said agreement of July 31st, 1959 was not rescinded as contended by defendants."

From its findings the trial court concluded that the plaintiff was entitled to judgment against both defendants and each of them for $12,026, plus interest, and against the defendant Herning alone for the additional sum of $6,373.96 and interest.[2] Judgment was entered accordingly and this appeal followed.

Predominant among the numerous errors specified by the appellants is the claim that the judgment and findings of

1. The purported facts regarding the rescission by the parties of the contract of July 31, 1959, for the purchase of the D8 tracks, the D8 tractor and the pump are set forth in the affirmative defense of defendant Herning's second amended answer as follows:

"That in the late Fall of 1959, the defendant contacted the plaintiff in regard to the payments then due on the purchase of said equipment and the defendants were informed by plaintiff that the deal was off and that he was keeping the equipment, and not accepting any money on the sale and purchase of said equipment or on the Beshore account. Defendants consented to the said recision of the agreement of sale and purchase of said equipment, informed the plaintiff that

the [D8] Cat Tracks were at Wein Airlines at Fairbanks Airport. That defendants did not object to said recision of contract by plaintiff as the plaintiff had burned out the motor of the D8 Cat [tractor] and the same was in an inoperable condition and could not be put in condition for use without the expenditure of several thousand dollars for a new motor and freight on the same to the place where the Cat had been abandoned by plaintiff near Kugruk River."

2. The $12,026 item represents the $11,000 and the $1,026 mentioned in the fifth and sixth paragraphs of this opinion; while the $6,373.96 figure represents the principal and interest on the $5,400 note discussed in the fourth paragraph of this opinion.

fact are contrary to the evidence and that the trial court erred in failing to make certain findings which the defendants contend should have been made. Our examination and study of the record leaves us without any doubt that the evidence supports the findings and judgment entered, and that there was no clear error in the failure of the court to make certain other findings now urged by the defendants. True, there was sharp conflict in the evidence on some of the issues raised at the trial, but it was the business of the trial court, not ours, to resolve those issues by its findings. Only if there is clear error in the findings or lack of findings will this court interfere.[3]

■ One of the major issues raised by the defendants is that the court erred in finding that the defendant Herning was responsible in any sum of principal or interest on the $5,400 note co-signed by him with Ringstad and the plaintiff and delivered to the First National Bank on December 30, 1957. The proceeds of this note, it will be remembered, were used to pay up another promissory note then due to Beshore in the sum of $5,430. The reason which they give for Herning's nonliability is grounded by the defendants upon asserted principles of contribution and common liability among co-signers or joint makers, the theory being that the plaintiff by paying off the bank's note was entitled at the most to sue Herning for contribution in

proportion to his share of the common liability.

Such a theory is not relevant to any issue raised by the defendants' pleadings, for, as pointed out by the plaintiff, no counterclaim for contribution or set-off was ever urged by the defendant Herning against the plaintiff. Furthermore, the theory disregards completely the trial court's specific finding that the defendant Herning had orally promised the plaintiff that he, Herning, would be solely responsible for the payment of the $5,400 note.[4]

■ Another issue raised by the defendants is their contention that the contract of July 31, 1959, was bilateral and that its breach by the plaintiff through his failure to deliver the D8 tracks, the tractor and the pump to the defendants excused nonperformance on their part. This argument assumes that the plaintiff was obliged to deliver the machinery to the defendants at some designated place. We find no such obligation expressed in the contract, the pertinent part of which simply states:

"Harold Herning and George Horner agree to pay to Walter Wigger $11,000 (eleven thousand dollars) for one D8 cat and One D13000 pumping unit located on the Kugruk River. * * *

"Included in the above machinery is one set of D8 tracks located in Fairbanks, Alaska."

Nor did the defendants produce evidence of any agreement or custom under which

3. Civil Rule 52(a) provides, in part, that "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." In discussing an identical provision in the Federal Rules of Civil Procedure, the Court of Appeals for the Ninth Circuit stated: "Nor is it necessary that the trial court make findings asserting the negative of each issue of fact raised. It is sufficient if the special affirmative facts found by the court, construed as a whole, negative each rejected contention. * * *" Carr v. Yokohama Specie Bank, Ltd., 200 F.2d 251, 255 (9th Cir. 1952). Ogden v. State, 395 P.2d 371 (Alaska 1964).

4. In testifying about the negotiations which led up to the agreement of July 31, 1959, the plaintiff stated:
"A. And, after purchasing the ground, they [the defendants] needed a cat and pump and they wanted to know how much I wanted for the cat and the pump and at that time there was still a[n] amount of approximately a thousand dollars owing Mr. Beshore, and I had approximately $11,000 invested in the cat and pump at that time, and at that time also there was this note at the bank for $5400.00, and I asked the defendants who was going to pay the note at the bank because all I wanted to do was get out, and Mr. Herning volunteered to—"

the plaintiff was obliged to make delivery at some particular place. Under these circumstances we look to the Alaska statute on the subject and there read:

"Whether it is for the buyer to take possession of the goods or for the seller to send them to the buyer is a question depending in each case on the contract, express or implied, between the parties. Apart from any such contract, express or implied, or usage of trade to the contrary, the place of delivery is the seller's place of business if he have one, and if not his residence; *but in case of a contract to sell or a sale of specific goods, which to the knowledge of the parties when the contract or the sale was made were in some other place, then that place is the place of delivery.*" [Emphasis supplied.] [5]

The italicized portion of the statute is the law of this case on the subject of delivery and negates the defendants' claim that the plaintiff was obliged to do something more to complete delivery. The conduct of the defendants, too, is in direct refutation of the existence of any such obligation, as appellee's counsel points out in the following quotation from his brief:

"The tracks mentioned in the agreement were picked up by the appellants [defendants] at Fairbanks, Alaska where they were located at the time of sale and the appellant Herning reluctantly admitted on cross-examination his exercise of control over the D8 cat located on Minnehaha Creek [in the Kugruk River area] by dispatching an employee to that site to determine whether or not it was feasible to start the cat. Additionally, appellants on the same day executed and delivered to appellee [plaintiff] the promissory note for the purchase price contemplated by said agreement. * *"

Tied in with the defendants' argument that the plaintiff breached the contract are

their claims that the plaintiff prevented them from performing their obligation under the contract by refusing to accept payment from them for the machinery, and that the parties rescinded the contract by mutual consent. We have already ruled against the defendants on the issue of whether the contract was mutually rescinded; since we are holding that the plaintiff had done all that was required of him under the contract in the way of delivering the machinery, all that remained was for the defendants to fulfill their promise of payment.

■ Regarding the alleged refusal of the plaintiff to accept payment from the defendants for the machinery, the defendant Horner testified as follows:

"A. Well, uh, the time that I specifically remember was the end of November or the first part of December, 1959. I was out at Yukon Supply on Cushman Street and Mr. Wigger had stopped as I was coming out and we had conversation to this dealing, and at that time he had told me that, since we had never made this first payment to Mr. Beshore by August, that the deal was off."

The account given by the plaintiff of the same incident contradicts much that Horner related, for example:

"Q. What is your recollection of what the conversation was?

"A. [By the plaintiff] Well, my recollection of it was that two or three days previous to that I called him on the phone and asked him why they hadn't paid Mr. Beshore. I had received another letter from him demanding payment and—or stating that he had not received payment from either Mr. Herning or Mr. Horner and, as I recall, I called him on the phone and he said he was going to contact Mr. Herning about it, and when I saw him—or saw his pickup out at the Yukon Supply, I pulled in there and

5. Section 29-1-93(1), ACLA 1949 [now AS 45.05.084(1) and (2)].

asked him about the payment. At that time we also talked about the tracks, as near as I can recall, and they were going to pick them up, which they did.

"\* \* \*

"Q. Do you recall ever having made any declaration that the deal was off?

"A. No, I do not.

"Q. Did you consider it to be at that time an existing obligation on their part?

"A. I did."

■ The final argument of the defendants is that the trial court erred in denying their motion to vacate a writ of attachment issued in favor of the plaintiff. We shall not elaborate upon the details connected with the writ other than to mention that it appears to have been levied against certain real property of the defendants.

The defendants point out that the parties provided in their contract of July 31, 1959, that

"This agreement is to be secured by a note from Harold Herning and George Horner, to Walter Wigger *the security for which will be the above mentioned Machinery.*" [Emphasis supplied.]

The defendants also allege that the plaintiff "retained and exercised absolute dominion and ownership of the cat and the pumping unit" and conclude that "it is abundantly clear that the subject matter could not have been subject to attachment."

In their reply brief the defendants add that their objection in the lower court to the issuance of the writ had been made upon the ground that the plaintiff already had a lien and mortgage upon the personal property in question and that the plaintiff swore falsely when he stated in his affidavit for attachment that the payment of the defendants' indebtedness to him had not been secured by any mortgage or lien upon real or personal property.[6]

The record does not disclose the existence of any kind of documentary mortgage or lien in favor of the plaintiff upon the machinery in question. The defendants undoubtedly have reference to a possessory type of lien because in discussing the issuance of the writ of attachment they contend that the plaintiff "retained and exercised absolute dominion and ownership of the cat and pumping unit" and "that such 'security' was in the appellee's [plaintiff's] exclusive 'possession'."

Since we have ruled that the plaintiff had effected delivery of the machinery in the manner prescribed by the law applicable to the facts of this case, it follows that he could not at the same time have exercised "absolute dominion and ownership" of the machinery and retained it in his "exclusive possession," as claimed by the defendants. Under the circumstances the allegations of the plaintiff that the payment of the indebtedness sued upon "has not been secured by any mortgage lien or pledge upon real or personal property," as set forth in his affidavit for attachment, were not false, and therefore the issuance of the writ was perfectly in order. Even if it could have been said that the trial court erred in refusing to vacate the writ, the defendants have made no claim or showing that they were prejudiced in some substantial way by the trial court's action.[7]

Finding no error, we affirm the judgment of the trial court.

6. Civil Rule 89(a) (3) provides that a plaintiff seeking a writ of attachment must file an affidavit with the clerk of the court showing that the payment of the debt sued upon has not been secured by any mortgage, lien or pledge upon real or personal property.

7. Briggs v. Kelly, 376 P.2d 715 (Alaska 1962).