STATE of Alaska, Appellant,

v.

William A. STANLEY, Appellee.

William A. STANLEY, Cross-Appellant,

v.

STATE of Alaska, Cross-Appellee.

Nos. 1598, 1601.

Supreme Court of Alaska.

March 5, 1973.

Rehearing Denied April 27, 1973.

---

John E. Havelock, Atty. Gen., Juneau, John A. Reeder, Jr., Asst. Atty. Gen., W. C. Arnold, Anchorage, for appellant and cross-appellee.

Donna C. Willard, of Walton & Willard, Edgar Paul Boyko, of Edgar Paul Boyko & Associates, Anchorage, for appellee and cross-appellant.

## OPINION

Before RABINOWITZ, C. J., and CONNOR and BOOCHEVER, JJ.

BOOCHEVER, Justice.

This case arises out of the sinking of the crab vessel, Lynn Kendall, while in the possession of representatives of the State of Alaska, who had seized the vessel for alleged possession of undersized king crab.

William A. Stanley was the owner and operator of the vessel, which was built in 1965 and measured approximately 50 feet in length. On September 8, 1968 the Lynn Kendall arrived at Kodiak with a full load of crab. Early the following morning the tanks of the vessel were pumped and unloading was commenced at the Northern Processers' dock. During the unloading, Floyd Short, an official of the Alaska Department of Fish and Game who was in charge of the king crab enforcement division of the Kodiak region, directed Stanley to dump a bucket of crab on the dock for measurement. Subsequently Short advised Stanley that he had found some undersized crab and asked permission to search the boat. Permission was given.

At approximately 4:00 p. m. the unloading had been substantially completed and clean-up work by the crew was in progress. Stanley testified that it would have taken approximately two hours to finish the unloading and clean-up of the vessel. At that time Short went aboard and told Stanley and the crew members that they were

under arrest and that the vessel was being seized. He said that Stanley was going to jail and would not be allowed to make bail. Stanley asked permission to finish the clean-up work, to move the vessel to the small boat harbor, and to appear in court the following morning with his crew members. This request was refused, and Stanley and the crew were allowed but a very brief period of time to obtain their shaving gear and similar personal possessions. They were then taken to jail. Neither Stanley nor the crew had an opportunity to go into the engine room or other portions of the vessel. The sole outside door to the vessel was locked and Short took the key. The vessel was then towed by the Kittiwake, an Alaska Department of Fish and Game vessel, to the Kodiak small boat harbor where the Lynn Kendall was tied fore and aft to the Kittiwake. The only access to the Lynn Kendall was across the Kittiwake or by water.

Short made no inspection of the Lynn Kendall. He knew nothing about her piping or valve system and made no inquiries concerning them. He did not go to the engine room and he made no effort to "sound" the bilges (ascertain by measurement the amount of water therein) or to check as to whether the vessel might be taking water. There was no inquiry made pertaining to the pumps of the vessel or as to how they might be operated.

At about 9:30 p. m. Short went aboard the Lynn Kendall and cursorily looked into the pilot house. At approximately 11:30 p. m. Mr. Newburn, who at that time was in charge of the Kittiwake, noticed that the lines securing the Lynn Kendall had slackened, allowing the vessels to drift two to three feet apart. The knots of the ropes were in the same condition as he had left them previously. He took in the slack and went to bed at approximately midnight. Since the vessels originally had been tied tightly together with the deck of the Lynn Kendall higher than that of the Kittiwake,

the logical explanation for the slackening of the ropes was that the Lynn Kendall was taking on water.

At approximately 3:25 a. m. on September 10, 1968, Newburn was awakened by someone advising him that the Lynn Kendall was sinking. He attempted to start a two-inch pump on the Kittiwake in order to pump the water from the Lynn Kendall, but the Kittiwake's pump would not start.[1] There had been previous difficulty with this pump. The harbor master arrived with another pump which would not start either.

As the Lynn Kendall filled with water it was held afloat by the lines fastening it to the Kittiwake. At approximately 4:00 a. m. Newburn abandoned hope for saving the Lynn Kendall and cast off the lines holding her; she sank immediately.

Stanley, who had been released on bail on the night of September 9, made a prompt request to be permitted to raise the vessel. The permission was not granted. After approximately 10 days the City of Kodiak commenced an action to require the removal of the vessel on the grounds that it constituted a nuisance. Thereafter the State did raise the Lynn Kendall. During this process divers were sent down and it was determined that the sea chest valve was partially open. Upon raising the vessel, inspections revealed that the starboard bilge valve was at least partially open, as were other valves in the bilge and ballast piping system. The starboard bilge valve had been installed by Stanley without a check valve or strainer, as he considered it important to have the valve operable without the possibility of obstructions which may occur when a check valve and strainer are utilized.

Eventually Stanley was acquitted of the charge of violating Fish and Game regulations and the State tendered the vessel to him in its damaged condition. He refused to accept it unless it was repaired and the State would not agree to repair it. Stan-

---

1. Newburn was able to start a smaller pump, but its flow was insufficient to save the Lynn Kendall.

ley thereafter brought suit against the State, Short and other employees of the Alaska Department of Fish and Game, alleging damages attributable to their negligence.[2]

After a lengthy and hard fought trial, legal memoranda were submitted and Judge Davis rendered a carefully detailed 22-page opinion awarding judgment to the plaintiff for the value of the vessel, lost personal belongings and loss of use of the vessel. Prior to the rendering of the decision of the court all of the individual defendants, with the exception of the defendant, Short, were dismissed with the consent of the plaintiff. At the conclusion of the case Judge Davis granted a motion to dismiss as to the defendant, Short.

The State has appealed from the judgment against it and Stanley has cross-appealed with reference to the amount of the damages and the dismissal of defendant, Short.

## THE STATE'S APPEAL

■ The trial was before the superior court judge without a jury in accordance with the requirements of AS 09.50.290.[3] The trial court directed that its opinion should constitute findings of fact and conclusions of law.[4] In reviewing such cases

we have held that the findings of the trial court will not be disturbed unless they are clearly erroneous.[5] It is in accordance with that standard that we must consider the State's contention that the trial court erred in holding for the plaintiff.

Both parties agree that the law of bailment applies when a public official seizes property, and each cites Harris v. DeVeau, 385 P.2d 283 (Alaska 1963), as setting forth the applicable legal principles. In *Harris* the defendant had borrowed a radar set to use aboard his vessel. It was damaged when a heavy sea broke the pilot house window. We stated:

> Regardless of the type of bailment and the degree of care required of the bailee, the trend of modern authorities is in support of the rule that in order to throw the duty of proceeding with actual proof of negligence upon a bailor who has made out a prima facie case by showing that the chattel involved was damaged or destroyed while in the possession of the bailee, the *bailee must not only prove* that the damage or loss occurred *by reason of* theft, fire or other *cause beyond his control, but produce further evidence in explanation of the actual damage or loss which would indicate exercise of care on his part in the*

2. AS 09.50.250.

3. AS 09.50.290 provides:
 Actions against the state under §§ 250–300 of this chapter shall be tried by the court without a jury.

4. Alaska Rule of Civil Procedure 52(a) provides:
 In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge

of the credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b).

5. Alaska R.Civ.P. 52(a); Alaska Foods, Inc. v. American Mfrs. Mut. Ins. Co., 482 P.2d 842 (Alaska 1971); State v. Phillips, 470 P.2d 266 (Alaska 1970); Ayers v. Day & Night Fuel Co., 451 P.2d 579 (Alaska 1969); Herning v. Wigger, 398 P.2d 1002 (Alaska 1965). The same rule applies in admiralty. Fed.R.Civ.P. 52 (a); Trinidad Corp. v. Indian Towing Co., 293 F.2d 107, 109–110 (5th Cir. 1961).

*protection of the property.* It is reasoned, and we think rightly so, that the bailee being in possession of the chattel is in a better position to explain the origin of the fire or the circumstances of the theft or other cause which would determine whether the loss or damage was due to negligence. He should disclose, to the extent that he is able, the manner in which the damage or loss occurred, the facts and circumstances attending such damage or loss and the precautions taken to prevent it. This the defendant failed to do. In other words, he failed to carry the burden of proceeding with the evidence after the plaintiff had established a prima facie case and therefore the trial court committed no error in awarding damages to the plaintiff for injury to the borrowed indicator. 385 P.2d at 286 (footnotes omitted, emphasis added).

It is to be noted that the defendant explained the cause of the damage to the radar set—the heavy sea—but nevertheless failed to carry the burden of proceeding with the evidence.

■ Thus once the plaintiff-bailor has established the fact of a bailment and damage or destruction of the chattel involved, the defendant-bailee must prove two things:

1. that the cause of the damage or destruction was beyond his control, and

2. that there is evidence in explanation of the damage which would indicate care on his part in the protection of the property. It is only after the defendant-bailee has presented satisfactory evidence with reference to both requirements that the burden of proving specific negligence is placed upon the plaintiff-bailor.

■ The State argues that the sinking was attributable to someone criminally or negligently opening the valves on the vessel, a cause beyond its control; but fails to muster any substantial argument indicating care on its part.

While it was reasonably established that the vessel sank due to the valves being at least partially open, the court specifically found:

. . . that it has not been established even by inference, that anyone deliberately scuttled the vessel LYNN KENDALL, and I find specifically that neither Stanley nor the members of his crew had either any opportunity or any motive to scuttle the vessel LYNN KENDALL.[6]

With reference to the exercise of care on the part of the State the court stated:

Short, himself, had been a part owner of and a master of a crabbing vessel. He had some experience in operation of crabbing vessels. With reference to the LYNN KENDALL, after removing her captain and crew and delivering them to the jail he made no inspection at all of the LYNN KENDALL. He knew nothing about her piping or her valve system and made no inquiry of anyone who might know concerning those matters. He never at any time went into the engine room. He made no effort to "sound" the bilges or to check in any way as to whether the LYNN KENDALL might or might not be taking water. He made no arrangements for securing the vessel except to have her moved back away from the finger floats in the small boat harbor so that she could not be boarded from such finger floats. He made no request of Captain Newland or Mr. Newburn or, for that matter, of anyone else, that they watch over or guard the LYNN KENDALL. As above-mentioned he checked the LYNN KENDALL in a cursory sort of inspection about nine o'clock in the evening in question, but at that time made no effort to determine as to whether the vessel was or was not taking water, or as to whether she was or was not secure, or as to whether she was safe from van-

6. The State's argument that the damage was caused by the intervening act of third parties is disposed of by this ad-verse finding, which we hold not to be clearly erroneous.

dalism. He made no inquiry of anyone concerning the pumps on the vessel, or as to how the pumps might be operated. In addition, the court noted that nothing was done when Newburn observed that the lines had slackened between the Kittiwake and the Lynn Kendall at approximately 11:30 p.m.;[7] that the Kittiwake's two-inch pump was inoperable; and that the actual sinking occurred as a result of casting off the lines by which the Kittiwake was keeping the other vessel afloat.

There is evidence to support all of those findings by the court, and none of them may be said to be clearly erroneous. Based on those findings the trial judge stated: "They didn't even use elementary good sense in dealing with the vessel. They did not use due care for the protection of the vessel. In fact they used no care at all." Thus, although the State made an attempt to show the cause of the sinking, it failed to present evidence indicating care on its part as required by the test set forth in *Harris*. The State failed to carry its burden of establishing care on its part in protecting the Lynn Kendall, and therefore the trial court did not err in holding the State liable for damages to the Lynn Kendall.

 The State argues, however, that its liability is derivative, so that the dismissal of the individual state employees automatically involves a finding either of no negligence on the part of its agents proximately causing the loss or, in the alternative, the performance of discretionary functions by the employees for which the State is immune from suit under the provisions of AS 09.50.250.[8]

The dismissals of all of the individual state employee defendants, with the exception of Short, were by the express consent of the plaintiff, Stanley, and thus did not involve an adjudication on the merits as to their negligence or performance of discretionary functions. The situation is apposite to that considered by us in Austin v. Fulton Insurance Company, 498 P.2d 702 (Alaska 1972). In that case the Fulton Insurance Company's agent had been dismissed as a defendant without an adjudication on the merits of his alleged negligence. We held that such a dismissal of the agent was not a bar to continuance of the suit against the principal based on derivative liability. Similarly, the dismissal by consent of various individual defendants did not bar a finding of liability on the part of the State. As discussed above, there was ample evidence to indicate negligence on the part of such employees which constituted a proximate cause of the loss.

 With reference to the defendant, Short, the dismissal was on the merits, but as indicated below, we find that he should not have been dismissed as a defendant. His dismissal was apparently based on the authority of Bridges v. Alaska Housing Authority, 375 P.2d 696 (Alaska 1962), wherein the dismissal of individual officers of the state agency was upheld. The officers had exercised "discretionary power in causing appellant's land to be taken and

---

7. Had an inspection been made, it is highly probable that discovery would have been made of the fact that the Lynn Kendall was taking on water. The valves could have been closed, and there would have been ample time to secure help and a suitable pump to prevent the sinking which did not occur for another five hours.

8. AS 09.50.250 provides in part:
 *Actionable claims against the state.* A person or corporation having a contract, quasi-contract, or tort claim against the state may bring an action against the state in the superior court

 . . . . However, no action may be brought under this section if the claim
 (1) is an action for tort, and is based upon an act or omission of an employee of the state, exercising due care, in the execution of a statute or regulation, whether or not the statute or regulation is valid; or is an action for tort, and *based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty* on the part of the state agency or an employee of the state, whether or not the discretion involved is abused; . . . . (Emphasis added.)

her buildings to be destroyed." (*Bridges* at 702.)

The "discretionary function" immunity from suit has been discussed in depth in our recent opinion, State v. Abbott, 498 P. 2d 712 (Alaska 1972). Justice Erwin, speaking for the court, stated:

> Once the basic decision to maintain the highway in a safe condition throughout the winter is reached, the state should not be given discretion to do so negligently. The decisions at issue in this case simply do not rise to the level of governmental policy decisions calling for judicial restraint. Under these circumstances the discretionary function exception has no proper application. 498 P.2d at 722 (footnotes omitted).

Similarly, in the subject case, once the decision had been made to seize the Lynn Kendall "the state should not be given discretion to do so negligently." The failure to exercise proper care, as detailed above and in the trial court's opinion, does not rise to the "level of governmental policy decisions" to which the discretionary function immunity from suit applies. Stated otherwise, the acts occurred at the operational, rather than at the planning level, and consequently do not come under the umbrella of discretionary function immunity.

■■ The State further contends that the court committed reversible error by failing to find that the plaintiff, Stanley was contributorily negligent in altering the vessel by installing the bilge valve without a check valve and strainer and by not warning the State about it.[9] The trial court found "that the installation and maintenance of the valve . . . did not render the vessel unseaworthy." The finding is not clearly erroneous since only if the valve were opened at the same time as other valves were opened was it possible for it to flood the vessel. Evidence further indicated that the installation of the valve accomplished a useful purpose in permitting speedy drainage.

Since the valve did not render the vessel unseaworthy there was no duty on the part of Stanley to warn of its existence. All vessels similar to the Lynn Kendall are equipped with valves and the location of the valves, including the one in question, were readily visible.[10]

## THE CROSS–APPEAL

Stanley has filed a cross-appeal contending that the trial court erred by dismissing the action against the individual defendant, Short, and by not awarding additional damages. The trial court grounded its dismissal of the defendant, Short, on the theory that he was acting within the scope of his duties as an official of the State of Alaska and within the scope of permissible discretion.

■ Based on the evidence presented, the trial court could have found that the defendant, Short, was negligent in performance of various functions after he had exercised his discretion to seize the vessel. Thus, arguably, Short's failure to check the valves, to assure that there were proper pumps available, to "sound" the bilges, to give proper instructions to the personnel of the Kittiwake, and to permit Stanley to secure the vessel, could all form bases for liability. Each of these omissions could be regarded as a proximate cause of the sinking, which in all likelihood would not oth-

9. Admiralty law governs this case and accordingly comparative negligence rather than contributory negligence is applicable. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 408–409, 74 S.Ct. 202, 204–205, 98 L.Ed. 143, 150 (1953) ; Steamer Max Morris v. Curry, 137 U.S. 1, 12, 11 S.Ct. 29, 32, 34 L.Ed. 586, 588 (1890) ; W. E. Hedger Transp. Corp. v. United Fruit Co., 198 F.2d 376, 378–379 (2nd Cir.

1952) ; Intagliata v. Shipowners & Merchants Towboat Co., 26 Cal.2d 365, 159 P.2d 1 (1945).

10. The State further argues that the court below erred by indicating that there was a duty on the State to "watch over or guard" the vessel. We do not reach this point since we do not consider it material in view of the other findings of failure to exercise due care.

erwise have occurred. While a public employee, such as Short, may not be held liable for acts done in line of official duty involving a mistake in judgment or discretion, or because of erroneous interpretation and application of law,[11] it is well established that the immunity from suit does not apply to the negligent performance of acts not involving such discretionary judgment-policy decisions.[12]

We conclude that the trial court erred by holding that Short's nonfeasance came under the scope of *Bridges'* immunity for mistakes of judgment or discretion. The subject case will have to be remanded for further findings as to whether Short was negligent, and whether such negligence was a proximate cause of the damage to the vessel.

Stanley has also cross-appealed on the issue of damages as to the fair market value of the vessel at the time of its taking, the period for which lost earnings were awarded and the amount allowed for loss of earnings.[13]

■ The court found the vessel to be a constructive total loss. That finding must be upheld on this appeal because, based on the evidence presented, it is not clearly erroneous. Under such circumstances the measure of damages for loss of the vessel is its fair market value at the time of its destruction.[14]

■ The court based its award on the proper measure of damages, the value of the vessel when taken immediately before its sinking. The court found that value to be "at least $100,000" and additionally found a loss to Stanley's personal gear and equipment of $5,300.[15]

The court, however, relied upon the mistaken assumption that Stanley testified that the value of the vessel when taken was at least $100,000. We have found no such testimony. Stanley did state that he paid slightly in excess of $100,000 for the vessel when constructed in 1965, and that subsequently improvements were added at a cost of from $10,000 to $15,000. Those improvements were in addition to the personal belongings of Stanley for which allowance was made in the judgment. All testimony was in agreement that the vessel would have appreciated rather than depreciated in value.[16] Since it appears that the court was mistaken as to the testimony on which it based the award of $105,400, we remand for the purpose of re-examination of this aspect of the case and redetermination of the amount to be awarded for the fair market value of the vessel as of September 10, 1968.

■ Stanley also contends that the court used improper criteria for ascertaining damages for loss of use of the vessel and the period of time for which such damages should be allowed. The court pointed out that there is a dispute as to allowance of damages for loss of use in case of total destruction.[17] The propriety of al-

---

11. Bridges v. Alaska Housing Authority, 375 P.2d 696, 702 (Alaska 1962).

12. Wolfsen v. Wheeler, 130 Cal.App. 475, 19 P.2d 1004, 1007–1008 (1933) ; Proper v. Sutter Drainage Dist., 53 Cal.App. 576, 200 P. 664, 666 (1921) ; Perkins v. Blauth, 163 Cal. 782, 127 P. 50, 53 (1912) ; Antin v. Union High School Dist., 130 Or. 461, 280 P. 664, 669 (1929) ; cf. Brady v. Roosevelt Steamship Co., 317 U.S. 575, 580, 63 S.Ct. 425, 428, 87 L.Ed. 471, 476 (1943).

13. These issues come before us in Stanley's appeal as to the amount of the damages, so that our sole inquiry pertains to the adequacy of the sums awarded. Only in that context are questions considered as to the permissibility of certain of the items of damage or their possible excessiveness.

14. Guido v. Hudson Transit Lines, Inc., 178 F.2d 740, 742 (3rd Cir. 1950) ; Peterson v. Bachar, 193 Kan. 161, 392 P.2d 853, 856 (1964).

15. The total awarded for these items was $105,400 involving a clerical error of $100. No objection has been raised as to that minor discrepancy.

16. No testimony was presented, however, as to whether or not equipment on the vessel as distinguished from the vessel, itself, would depreciate.

17. Among cases allowing damages for loss of use despite total loss of property are

lowing such damages has not been raised as an issue on this appeal, and we, therefore, do not reach that point.

The court allowed damages for loss of use for "a reasonable time to accomplish a replacement of the article." It considered the fact that "Stanley had no funds at all to replace the vessel." Damages were awarded for a period of 18 months. We do not find that the evidence presented requires an award for a longer period of time.[18]

A more difficult problem is presented as to the measure of damages for the loss of use. The court found that Stanley's testimony in attempting to reconstruct his earnings and expenses was too speculative, and based the award on his annual net income as reported for income tax purposes during the two years prior to the seizure.

Normally, net income as reported for income tax purposes is not a proper basis for ascertaining damages for loss of use.[19] As pointed out by appellant, there may be many deductions reported for income tax purposes unrelated to actual op-

erating expenses. For example, substantial depreciation deductions having little relationship to the actual decrease in value of the item involved may be utilized in accordance with Internal Revenue Service regulations. Similarly, in any one year there may be unusual expenses unrelated to the normal costs of doing business.

In determining the amount of damages to be awarded for loss of use of property, we are guided by the general principles applied in tort cases:

The general principle underlying the assessment of damages in tort cases is that an injured person is entitled to be replaced as nearly as possible in the position he would have occupied had it not been for the defendant's tort.[20]

As applied to the loss of a vessel, the damages would be the vessel's share of gross earnings reasonably anticipated for the period involved, as distinguished from the shares earned by the captain and crew, less the expenditures which would have been chargeable to the owner.[21] Assuming that the use of income tax figures was not a

Reynolds v. Bank of America Nat'l Trust & Sav. Ass'n, 53 Cal.2d 49, 345 P.2d 926, 927 (1959); Park v. Moorman Mfg. Co., 121 Utah 339, 241 P.2d 914, 921 (1952); Knapp v. Styer, 280 F.2d 384, 390–391 (8th Cir. 1960); contra, Hayes Freight Lines, Inc. v. Tarver, 148 Ohio St. 82, 73 N.E.2d 192, 193 (1947); Kohl v. Arp, 236 Iowa 31, 17 N.W.2d 824, 826 (1945); Magnolia Petroleum Co. v. Harrell, 66 F. Supp. 559, 561 (W.D.Okl.1946); Ft. Pitt Gas Co. v. Evansville Contract Co., 123 F. 63, 64 (3rd Cir. 1903).

18. In case of total loss, damages for loss of use have been awarded for a reasonable period of time until replacement can be made. Reynolds v. Bank of America Nat'l Trust & Sav. Ass'n, 53 Cal.2d 49, 345 P.2d 926, 927 (1959); Peterson v. Bachar, 193 Kan. 161, 392 P.2d 853, 857–858 (1964); Guido v. Hudson Transit Lines, 178 F.2d 740, 742–743 (3rd Cir. 1950). Economic inability to replace property has been considered in Valencia v. Shell Oil Co., 23 Cal.2d 840, 147 P.2d 558, 561 (1944); New York Central R. R. v. Churchill, 140 Ind.App. 426, 218 N.E.2d 372, 376–377 (1966); Chesapeake & Ohio Ry. Co. v. Boren, 202 Ky. 348, 259 S.W. 711, 714 (1924).

19. See, e. g., Palmer v. Connecticut Ry. & Light Co., 311 U.S. 544, 560–561, 61 S.Ct. 379, 384–385, 85 L.Ed. 336, 342–343 (1941); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684, 691 (1927); Blanchard v. Makinster, 137 Or. 58, 290 P. 1098, 1 P.2d 583, 584–586 (1931); Weston v. Boston & M. R. R., 190 Mass. 298, 76 N.E. 1050, 1052 (1906).

20. Beaulieu v. Elliott, 434 P.2d 665, 670–671 (Alaska 1967). One proper method of ascertaining such loss is set forth in Dudley v. Bayou Fabricators, Inc., 330 F.Supp. 788 (S.D.Ala.1971), where average catches immediately before and after the period of loss of use were utilized as a base figure. The ship's share from the voyages that could have been undertaken was determined, and from that amount necessary expenditures were deducted.

21. Upon a showing of loss due to damage to a vessel or gear, the captain and crew may recover their loss of earnings proximately caused by negligence. Carbone v. Ursich, 209 F.2d 178 (9th Cir. 1953). There has been no claim presented in this case for the loss of earnings of crew members.

proper method of determining the amount to be awarded for loss of use of the vessel, our inquiry focuses on the question of whether, based on the evidence presented, the sum awarded was less than the amount which the court could have been justified in awarding had a proper measure of such damages been utilized. By necessity we must discuss the evidence on this subject in some detail.

The testimony presented on this issue consisted of evidence concerning the net income as determined for income tax purposes. and then adding thereto the amounts that had been deducted for depreciation, attorney's fees and other expenses of a law suit, crab pot losses, apartment rentals and certain improvements to the vessel such as a new hydraulic boom (which for some unexplained reason had been treated as a repair deduction rather than a capital improvement).[22] As indicated above, the trial court found Stanley's evidence "is too speculative to be of any particular value."

While we are mindful of the fact that in many cases it is difficult, if not impossible, to present evidence as to loss of future earnings, with the meticulous accuracy that may be achieved as to past losses, we hold that the court's finding as to the speculative nature of the testimony here presented was not clearly erroneous.

Based solely on two years' experience, Stanley attempted to equate his actual net earnings to 50 percent of his gross and then extrapolate to determine the amounts he would have netted in future years. Not only did this involve difficult forecasts of more substantial earnings in the future than in the past, but many of the items added back to the net income figures were suspect. Thus, there was no breakdown indicating the amount of depreciation on electronic or other equipment which obviously suffer from actual depreciation and obsolescence, as distinguished from the vessel itself which, according to the evidence, would appreciate in value. No satisfactory explanation was given as to the

22. Thus in 1966 Stanley reported gross earnings of $82,304.80 and net taxable income after all deductions of $15,565.58. To determine his true income from use of the vessel Stanley contended that the following items should be added to the net income:

| | |
|---|---|
| Depreciation | $10,008.32 |
| Unusual repairs | 3,265.26 |
| Attorney's fees | 1,170.17 |
| Crab pot loss | 3,789.60 |
| Travel expense in connection with a law suit | 500.00 |
| Telephone bills regarding the law suit | 1,000.00 |
| Boat clothing—an initial, not to be repeated, investment | 500.00 |
| Apartment rent | 428.00 |
| Wages of additional crew member no longer required after addition of the hydraulic boom | 7,904.59 |
| Total | $28,565.94 |

He testified that his adjusted income for the year would be $45,931.52. The $28,565.94 addition to his reported income of $15,565.58, however, totals but $44,131.52. In 1967 by similar computations $34,630.00 was added to the reported income

of $15,195.00 to obtain an adjusted income figure $49,825.00. Since gross earnings for the year were $100,211.10, the adjusted net income was approximately 50 percent of that amount. By use of the erroneous adjusted figure of $45,931.52 for the year 1966, Stanley contends that this again was close to 50 percent of the gross for that year, $83,304.00.

Similar computations were utilized for the portion of 1968 during which the vessel was used and estimates were then made of the gross earnings that might have been obtained for the balance of 1968. Estimates were likewise made for earnings that would have occurred in 1969 and 1970, which involved in part a conversion of the vessel to use in the salmon and shrimp fisheries, due to a drastic decline in quantities of crab. The computations were based on net earnings amounting to approximately 50 percent of gross revenue.

By utilization of this method, Stanley contends that he lost earnings from September 9, 1968, to the time of trial in the amount of $233,071.20 less his actual earnings in that period of approximately $21,000.00, or $212,071.20.

inclusion of crab pot losses as unusual expenditures. While legal expenses were considered as unusual and thus added back, a substantial recovery from a law suit unrelated to the present one was not considered in the computation. Moreover, the speculation of earnings for future years involved the utilization of the vessel in salmon and shrimp fisheries, ventures in which it had not previously been engaged. There was no effort to break down the vessel's lay (the share of the proceeds attributable to it and its equipment) from that of the individual members of the crew and the captain.

Based on the evidence presented, we therefore cannot hold as clearly erroneous the court's finding that the testimony was too speculative to be of any particular value.

■ We also note that the court awarded interest on the value of the vessel from the date of its loss. Such an award is to compensate for the loss of use of the funds representing the value of the vessel.[23] To grant such an award plus a separate one for damages attributable to loss of use of the vessel constitutes a double recovery.

In order to make a wronged plaintiff whole, under certain circumstances, it may be more appropriate to award the actual, provable damages attributable to loss of use of property than to award interest from the date of loss. Both interest and an award for loss of use of the property, however, are not permissible.

■ As we have indicated previously, our inquiry on this appeal is limited to the question of whether an inadequate amount was awarded for loss of use of the vessel. There has been no appeal by the State on the grounds that the award was excessive. Particularly in view of the additional allowance of interest, we cannot find that the amount awarded was inadequate so as to require a reversal of that portion of the judgment.

The judgment below is therefore affirmed, except as to the award for the loss of the vessel and the dismissal of the defendant, Short. The case is remanded for further proceedings as to those matters in accordance with this opinion.

ERWIN and FITZGERALD, JJ., not participating.

23. State v. Phillips, 470 P.2d 266, 274 (Alaska 1970).