[Civ. No. 2307. Fifth Dist. Jan. 23, 1976.]

JOE DAVID TONEY, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA, Defendant and Appellant;
PHILLIP WALKER, Defendant and Respondent.

**COUNSEL**

Irwin & Thuesen and Donald C. Thuesen for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, John M. Morrison and Philip B. Laird, Jr., Deputy Attorneys General, for Defendant and Appellant and for Defendant and Respondent.

**OPINION**

**BROWN (G. A.), P. J.**—Dr. Joe David Toney was a black professor of chemistry at Fresno State College.[1] Dr. Phillip Walker was the acting dean of the school of arts and sciences at the same institution. Toney sued Walker and the State of California (hereinafter "State") in two causes of action for defamation and intentional infliction of emotional distress. There were also fictitiously named defendants who were dismissed from the action at the pretrial conference. The jury returned a money verdict in Toney's favor against State only for $10,000. The verdict was in favor of Walker individually and against Toney on the complaint.

Walker cross-complained against Toney, alleging intentional infliction of emotional distress and false imprisonment. The jury found in favor of Toney and against Walker on the cross-complaint. No appeal has been filed from that part of the judgment.

State has appealed the judgment against it, and Toney filed an appeal from the judgment in favor of Walker on the complaint. However, Toney admits that he is seeking a reversal of the judgment as to Walker only if the judgment against State is reversed. Therefore, since we affirm the judgment against State, we need consider only those issues raised on State's appeal.

---

[1] As of that time the institution had not been denominated a "university."

## Facts

The imbroglio out of which this case arises was initiated at a meeting on March 19, 1970, held between 40 and 50 black students and Toney on the one hand, and at their request, and Walker on the other hand, in a conference room on the campus of Fresno State. The black students wanted to discuss certain problems relative to the ethnic studies program at the college.

Shortly after Walker began to address the group, one of the students shouted "Well, we don't want any of this procedural bullshit!" The rest of the students then joined in, indicating their discontent. Walker responded by saying, "If this is going to be turned into a shouting match I am not going to stay here." Walker attempted to leave but was told that he could not leave, and a group of the students moved to block his exit. Walker shouted for "security" (i.e., campus security officers), but no one responded to Walker's shout. He then sat down and refused to speak for approximately 45 minutes while the students taunted him with abusive language and insults. Walker attempted a second time to leave but was again prohibited from leaving.

Eventually the mood became more tranquil, and Walker believed that a productive interchange would be possible. Real communication between Walker and the students began to take place. However, the meeting once again became highly emotional. It was during this period of time that Toney spoke to Walker. Prior to the meeting Walker had never met Toney and he did not know Toney on sight. Only at some point during the meeting did Walker conclude that the faculty member attending the meeting and addressing him was Toney. Walker testified at trial that he could recall the substance of three statements addressed to him by Toney, whom he considered as having begun to assume a leadership role at the meeting. The first remark concerned the rehiring of a member of the ethnic studies faculty. Walker recalled the second statement as being, "Man, you better watch out because on some dark night on a street you are going to get run down," or "You might get run down by a car." The third·was an accusation that Walker was attempting to place the students in jeopardy of being charged with trespass. However, in his testimony Toney denied ever making the second statement or one similar to it, and Walker's assertion was not corroborated by anyone else at the meeting, including two Caucasian ·campus news reporters who attended the meeting.

At this time the campus police, who had been advised of the meeting previously, had become concerned for Walker's safety. One of the officers forced his way into the room and asked Walker if he wished to leave. Walker responded that he did and stood to leave. Immediately one of the students pushed Walker back into his seat and shoved the officer out of the room. The other students then began to barricade the two doors leading into the room with tables and chairs. A group of campus security officers then forcibly broke into the room through the makeshift barricades and lined the students and Toney up against the wall and photographed them. One of the officers then asked "Who is in charge of this group?" Toney responded, "I am. You know me. I am Toney." When the officers entered the room, Walker immediately left.

After leaving the room, Walker went directly to the office of Dr. Falk, the then president of Fresno State, to inform his office of what had occurred. Also present at some time during this meeting was Dr. James Fikes, executive vice president. Walker then proceeded to record his recollection of the day's events on a dictaphone. At approximately 5 p.m. Dr. Baxter, academic vice president of Fresno State, visited Walker, and Walker gave him a general outline of what had occurred that day. He implicated Toney by name as being actively involved during the latter part of the meeting and of assuming a position of leadership.

Walker decided to proceed with criminal and disciplinary proceedings against those whom he felt were responsible for the incident, specifically, Toney. The members of the administration with whom Walker discussed the incident, including Falk, Baxter and Fikes, indicated that they would support him whether he chose to take any action or not.

Walker caused to be filed against Toney a criminal complaint for breach of the peace and false imprisonment, and approximately seven days after the incident Toney was arrested. On motion of the district attorney, these charges were dismissed on May 6, 1970, for insufficient evidence and in the interest of justice.

On April 1, 1970, pursuant to Walker's request and under statutory authority,[2] President Falk suspended Toney from teaching for a period of 30 days.

---

[2]See Education Code section 24306, subdivision (b); California Administrative Code, title 5, chapter 5, article 2, section 43522.

Walker gave statements regarding the incident to various officials and members of the press, radio and television, and it received broad coverage. When Walker gave the statements to interviewers he knew they would be reported to the public and he never specifically used Toney's name. The press reports were generally straightforward statements of his version of the facts. There were also two televised interviews with Walker. A written copy of Walker's statement in one of the interviews is attached as Appendix 1.

There was only one publication in which Walker did not participate. This was an official release from the community relations office of the college, issued at a press conference called by President Falk and Fikes. This release was made on or about April 1, 1970, and it advised that Toney had been suspended and faced criminal charges and disciplinary action because of his leadership of the students at the meeting wherein Walker had been imprisoned and assaulted by the students, a copy of which is attached as Appendix 2.

On or about April 1, 1970, disciplinary proceedings requested by Walker were commenced pursuant to internal college administrative procedures prescribed in a document entitled "Transitional Disciplinary Action Procedures for Academic Personnel Executive Order No. 81" issued by the state college system. As required by that executive order, Dr. William Dienstein, a professor of criminology, was appointed as the initiator to investigate the facts and to frame charges that he felt were appropriate as revealed by the investigation. He interviewed 25 to 30 persons and reported to Walker and Toney that in his opinion there was no independent evidence to substantiate the charges and recommended that they be dropped. Walker refused to dismiss the charges, and the college administrators took the position that disciplinary proceedings could be dropped only at the request of Walker. This was contrary to prior practice as exemplified by the case of faculty member Cecil Coleman, against whom disciplinary action had been dismissed without the consent of the complaining party.

A three-member panel to hear the complaint was then selected by lot. Walker objected to the makeup of the panel. The panel did not proceed. As a result of Walker's refusal to dismiss and objections to the panel, the charges remained unresolved until December 2, 1970—a period of eight months. Such a long-standing request for discipline has adverse effects upon the career of a person in higher education.

On December 1, 1970, Toney was notified by Dr. Baxter, who had replaced Falk as president of the college, that he would not be rehired for the following academic year. No express reason was given for the decision not to retain Toney, and it was made despite very high recommendations from Toney's colleagues in the chemistry department. Apparently his technical qualification as an instructor in chemistry was not in issue.

On December 2, 1970, one day after Toney was notified that he would not be rehired, Walker caused the disciplinary charges to be dismissed.

Shortly after April 1, 1970, Toney complained to the Office of Fair Employment Practices of the State of California that his suspension and the disciplinary proceedings against him were being pursued because of racial bias of Fresno State officials, including Falk, Fikes and Baxter. Simon Connelly of that office investigated the charges between April 1970 and June 1971. After a preliminary investigation, completed in February 1971, Connelly reported to Baxter that he had concluded that a violation of the Fair Employment Practices Act had been committed in the suspension and notice of nonretention of Toney. Baxter then announced to Connelly for the first time that the "Walker incident" of March 19, 1970, had nothing to do with the action that had been taken against Toney. Baxter stated his reason for not retaining Toney was that some threats allegedly were made by Toney against a student, one Isaac Harris. Baxter claimed that around April 1970 Toney had threatened Harris with physical harm. Baxter claimed to have a written statement by Harris to that effect and alleged confirmation of the incident through another state college administrator, a Mr. Munson. Baxter had consulted with Isaac Harris and confirmed to his (Baxter's) satisfaction that the incident alleged by Harris was in fact true.

Connelly then conducted his own investigation of the Harris incident. He concluded that Harris had told several different stories, was vague and rambling in his account of the incident and generally gave a version of the facts which was not credible. It was also learned, at least by February 2, 1971, that Baxter knew that Professor Mark Bixler, an officemate of Toney, was an independent witness to the Harris incident. Baxter had sent Marvin Wampler to interview Bixler, and Bixler reported that there was no substance to the Harris claim. Nevertheless, Baxter continued to assert the Harris incident as a reason for his decision not to retain Toney.

After being advised he would not be retained, Toney took two courses of action. First, he filed a grievance under the administrative procedure then in effect at the college; and, secondly, he sought employment elsewhere.

He obtained employment at Atlanta University, Atlanta, Georgia. Shortly after written confirmation of his employment he was advised by Atlanta University that his potential employment was canceled because the university did not want to become embroiled in his difficulties with Fresno State. Atlanta advised that the university had received an unsolicited telephone call from Administrator William Fulkerson of Fresno State, who had called Atlanta at the direction of Baxter. Baxter had never on any previous occasion initiated a contact with any prospective employer of a faculty member who was not being retained or who had been terminated at Fresno State.

The grievance panel on campus which was formed to hear evidence concerning the reason for Baxter's nonretention of Toney ruled that the decision was improper and that Toney should be retained. Baxter rejected that recommendation. The evidence, gathered by this panel at Fresno State, then went to a statewide panel which, upon review, concurred with the local panel that Toney should be retained. Baxter again rejected the recommendation. Toney was finally retained only after the Chancellor of the California State College System directed Baxter to reverse his decision and to retain Toney.

## DISCUSSION

Preliminarily, we observe that State does not challenge the scope or content of the instructions, does not claim error regarding the admission or exclusion of any evidence, nor does State raise any issue as to the sufficiency of the evidence to support the implied finding by the jury that the torts of defamation and of intentional infliction of emotional distress upon Toney were in fact committed.

The primary thrust of State's position on this appeal can be summarized in the following concatenated statements: (1) Since Walker was exonerated by the jury, liability of State cannot be predicated upon Walker's activities or pronouncements; otherwise the verdicts as to Walker and State would be inconsistent. (2) The only other basis for the verdict against State is the official college press release of April 1, 1970 (see Appendix 2), in which Walker did not participate. (3) The press

release of April 1, 1970, was a discretionary act and State is immune from liability therefor under Government Code section 820.2. (4) The press release of April 1, 1970, is also privileged under Civil Code section 47, subdivision 3. (5) *Ergo,* the judgment against State for $10,000 must be reversed.

For the reasons about to be stated, we disagree with this analysis and conclusion and affirm the judgment. ██ First, we conclude that the press release of April 1, 1970, and Walker's actions are not the only potential basis of liability of State. A review of the pleadings, pretrial order, evidence and instructions demonstrates that this cause was tried by the parties and submitted to the jury upon the theories that the named defendants Walker and the State of California, acting by and through its agents in the course of their employment, including Walker but not limited to him, committed the torts of defamation of Toney and engaged in tortious conduct amounting to intentional infliction of emotional distress upon Toney, and that the named defendants (State and Walker) and unnamed agents of State (college administrators), or some of them, acted in a conspiracy to commit the mentioned torts upon Toney. Thus, the basic premise of State is in error. There is a clear legal and factual basis for a jury finding that State was liable for tortious conduct independent of Walker's liability and independent of the press release of April 1, 1970.

Secondly, State's liability is independent of that of Walker. There is no meritorious issue that the administrators involved in the conduct complained of were not acting in the course and scope of their employment. (See *Hardy* v. *Vial* (1957) 48 Cal.2d 577, 583 [311 P.2d 494]; *Neal* v. *Gatlin* (1973) 35 Cal.App.3d 871, 875 [111 Cal.Rptr. 117]; *Meester* .v. *Davies* (1970) 11 Cal.App.3d 342 [89 Cal.Rptr. 711].) ██ Further, it is clear that the State can be sued and held liable without naming the agents whose conduct the vicarious liability is predicated upon (see *Golceff* v. *Sugarman* (1950) 36 Cal.2d 152, 154 [222 P.2d 665]; *Mascarin Professional Pharmacy* v. *Hart* (1970) 13 Cal.App.3d 462, 466 [91 Cal.Rptr. 560]); and whenever several persons are sued as conspirators and the evidence supports a conclusion that a conspiracy existed, each member may be held responsible as a joint tortfeasor regardless of whether or not he directly participated in the act (*Unruh* v. *Truck Insurance Exchange* (1972) 7 Cal.3d 616, 631 [102 Cal.Rptr. 815, 498 P.2d 1063]; *Neblett* v. *Elliott* (1941) 46 Cal.App.2d 294, 302-303 [115 P.2d 872]). ██ Accordingly, the mere fact that the jury did not find defendant Walker liable for the tortious conduct complained of does not

mean that the defendant State could not be held vicariously liable for the conduct of its unnamed agents, that is, the administrators of Fresno State who were also involved.

Applying the above principles to the facts herein, the combination of the following incidents could support a finding by the jury that the defendant State, by and through the conduct of its agents other than Walker, was liable for the tort of intentional infliction of emotional distress: (1) the suspension of Toney by Falk; (2) the disciplinary proceedings, including permitting them to remain pending without action or disposition for eight months; (3) the method of announcing the allegations against Toney to the press on April 1, 1970; (4) the refusal to accept the recommendation of the initiator, Dr. William Dienstein; (5) the refusal to retain Toney in the face of recommendations from independent investigations to do so; (6) the findings of the California Fair Employment Practices investigator, Connelly, that the actions taken against Toney were motivated by racial bias; (7) the use by Baxter of false evidence as a basis for his decision to not retain Toney; (8) the clear inference that Baxter acted to prevent the subsequent employment of Toney at Atlanta University. Thus, the jury could have found that the aforementioned conduct of State's agents was intentional or reckless, that it was unreasonable, and that it resulted in emotional distress to Toney (see *Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 498-499 [86 Cal.Rptr. 88, 468 P.2d 216]; *State Rubbish etc. Assn.* v. *Siliznoff* (1952) 38 Cal.2d 330, 337-338 [240 P.2d 282]; *Golden* v. *Dungan* (1971) 20 Cal.App.3d 295, 302-311 [97 Cal.Rptr. 577]), and, as we have pointed out, State makes no argument that the evidence is not sufficient in this regard.

■ Moreover, there is evidence from which the jury could have concluded that State's agents did in fact "conspire" to pursue tortious conduct against Toney amounting to intentional infliction of emotional distress and that such conspiracy existed between State's agents without Walker being a participant therein. The meeting immediately after the incident of March 19, 1970, wherein Walker presented his proposed course of action to Falk and Fikes and obtained their approval and support, along with the events which followed, including the suggestive coincidence that the disciplinary charges against Toney were dismissed by Walker the day after Baxter notified Toney that he would not be retained for the following year, sufficiently evidence a conspiracy to engage in tortious activity.

Addressing the issue of immunity and privilege, we first discuss State's position that it is immune from liability because its acts or omissions were the result of the exercise of discretion pursuant to Government Code section 820.2.[3]

A public entity is not liable for the acts of its employees if the employee "is immune from liability." (Gov. Code, § 815.2, subd. (b).) Section 820.2 (see fn. 3, *ante*) makes the discretionary acts of public employees immune from liability. Since the acts of the college administrators were in the course of their employment (see *Hardy* v. *Vial, supra,* 48 Cal.2d at p. 583; *Neal* v. *Gatlin, supra,* 35 Cal.App.3d at p. 875; *Meester* v. *Davies, supra,* 11 Cal.App.3d 342), the crucial question of whether State was shielded from liability under the facts in this case turns upon the determination of whether the activities of the college agents constituted discretionary acts.

At the outset, the Supreme Court's observations in *Ramos* v. *County of Madera* (1971) 4 Cal.3d 685, 692 [94 Cal.Rptr. 421, 484 P.2d 93], are significant. It said: "We must begin with the well-settled notion that in governmental tort cases 'the rule is liability, immunity is the exception.' [Citation.] '[I]t would be unjust in some circumstances to require an individual injured by official wrongdoing to bear the burden of his loss rather than distribute it throughout the community.' [Citation.] 'Accordingly, courts should. not casually decree governmental immunity; . . .' [Citation.] Unless the Legislature has clearly provided for immunity, the important societal goal of compensating injured parties for damages caused by willful or negligent acts must prevail."

In *Johnson* v. *State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352], the Supreme Court held that the state could be held liable for injuries to foster parents inflicted by a teenage parolee where it is shown that the parole officer failed to warn the foster parents of the boy's homicidal tendencies and background of violence and cruelty. The court explicated that the decision to parole the youth comprises a resolution of policy considerations, is a discretionary act "entrusted by statute to a coordinate branch of government, that compels immunity from judicial reexamination." (*Id.,* at p. 795, fn. omitted.) The court continued, ". . . the determination as to whether to warn the foster

---

[3]Government Code section 820.2 provides: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."

parents of latent dangers facing them . . ." is the implementation of that basic policy and is not entitled to the protection of the discretionary immunity statute. *(Id.)* Supporting this analysis for immunity for basic policy decisions but rejecting it for ministerial implementation or the operational aspect of those basic policy and planning decisions, the court relied upon *Sava* v. *Fuller* (1967) 249 Cal.App.2d 281, 290 [57 Cal.Rptr. 312], and a long list of federal cases under the federal Tort Claims Act.[4]

In referring to the *Sava* case, the Supreme Court in *Johnson* said: "In *Sava* v. *Fuller, supra,* 249 Cal.App.2d 281, 290, a suit for malpractice against a state-employed botanist and the state, the court said: 'In the instant case . . . Dr. Fuller had already exercised discretion by agreeing to analyze the possible ingested plant substance to determine its toxicity. . . . [E]xercise-of-discretion had ended at that point and thereafter the inquiry would be limited to whether there had been an exercise of due care under a duty assumed. . . . [O]nce the determination has been made that a service will be furnished and the service is undertaken, then public policy demands (except when the Legislature specifically decrees otherwise) that government be held to the same standard of care the law requires of its private citizens in the performance of duties imposed by law or assumed.' " (69 Cal.2d at p. 796.)

The decision in *Johnson* represents a discursive analysis of this amorphous area of the law and to a large extent is a departure from prior criteria for determining if an act is entitled to the discretionary label.

In *Connelly* v. *State of California* (1970) 3 Cal.App.3d 744, 751 [84 Cal.Rptr. 257], this 'court held that the determination by the state Department of Water Resources "to issue flood forecasts is a policy-

---

[4]Those cases listed at page 796 of *Johnson* are: ". . . *United States* v. *Washington* (9th Cir. 1965) 351 F.2d 913, 916 (decision as to where to place wire across canyon was assumed to be discretionary, but failure to warn pilot was not); *United Air Lines, Inc.* v. *Wiener* (9th Cir. 1964) 335 F.2d 379, 397-398, cert. dism. *sub nom. United Air Lines, Inc.* v. *United States* (1964) 379 U.S. 951 [13 L.Ed.2d 549, 85 S.Ct. 452] (decision to conduct air flights was discretionary, but failure to warn commercial airline was not); *United States* v. *White* (9th Cir. 1954) 211 F.2d 79, 82 (decision not to 'dedud' army firing range assumed to be discretionary, but telling person about to go onto range that it was safe not discretionary); *Costley* v. *United States* (5th Cir. 1950) 181 F.2d 723, 724-725 (discretionary function to admit patient to hospital, but no immunity for treatment thereafter); *Bulloch* v. *United States* (D. Utah 1955) 133 F.Supp. 885, 889 (decision as to how and when and in what manner to conduct nuclear tests was discretionary, but failure to give proper notice was not); *Hernandez* v. *United States* (D. Hawaii 1953) 112 F.Supp. 369, 371 (discretionary to erect road block, but failure to warn of the hazard created was not); *Worley* v. *United States* (D. Ore. 1952) 119 F.Supp. 719, 721 (decision to use coyote traps assumed to be discretionary, but failure to warn is not)."

making function, a discretionary activity within the scope of governmental immunity, while gathering, evaluating and disseminating flood forecast information are administrative or ministerial activities outside the scope of governmental immunity." Though some time has transpired since the decision in *Connelly,* we cannot improve upon the accurate description therein of the rationale of *Johnson.* In *Connelly* this court said: "The Supreme Court, in *Johnson* v. *California, supra,* took a fresh approach to the question by rejecting the Judge Hand postulate that public officials will be insufficiently zealous unless immunity attaches to their discretionary acts. The court said it was motivated largely by the fact the 1963 Tort Claims Act, Government Code section 825.6, requires an employee to 'indemnify the public entity' only in instances where the employee acted outside the scope of his employment or 'acted with actual fraud, corruption, or malice.' (P. 791.) The court also rejected the reasoning of cases purporting to distinguish between discretionary acts and ministerial acts, upon the ground this is an impractical and unrealistic exercise in semantics. (P. 787.) After discarding the semantic and zealous-performance criteria for determining when an act involves an exercise of discretion and immunity attaches, the Supreme Court formulated a new criterion, new insofar as California is concerned, for determining when a governmental activity is within the ambit of discretion as delineated in section 820.2. The court used the doctrine of separation of powers as scaffolding to support its new 'touchstone' of 'judicial abstention in areas in which the responsibility for *basic policy decisions* has been committed to coordinate branches of government.' (P. 793.) Leaning heavily upon the language of *Dalehite* v. *United States* (1953) 346 U.S. 15 [97 L.Ed. 1427, 73 S.Ct. 956], the court equated the language 'discretion vested in him' (§ 820.2) with 'basic policy decisions.' In an exposition of the term 'policy making' the court said the distinction is 'sometimes described as that between the "planning" and "operational" levels of decision-making.' The court speaks of 'areas of quasi-legislative policy-making which are sufficiently sensitive to justify a blanket rule that courts will not entertain a tort action alleging that careless conduct contributed to the governmental decision.' (P. 794.)" (3 Cal.App.3d at pp. 749-750.) (See also *Meester* v. *Davies, supra,* 11 Cal.App.3d at p. 347.)

██ Applying the foregoing criteria to the facts of the case at bench, we believe the conclusion to be inescapable that the decision to issue press releases concerning events on a college campus "comprises the resolution of policy considerations," is a discretionary act and one which is properly entrusted to the authority of a coordinate branch of

government. However, the timing of any particular release, the content of any particular release, and the manner in which a release is made constitute the implementation of the policy, more properly described as the operational aspect of the policy, and are not entitled to the protection of the discretionary statute. It follows that State was not entitled to the discretionary immunity by reason of the content of the press release of April 1, 1970.

From what has been said, it is likewise apparent that State is not immune from liability for at least some of the acts we have heretofore listed upon which a finding of liability for the tort of intentional infliction of emotional distress can be based. For example, the self-initiated telephone call to Atlanta University and the inference that Baxter acted to prevent Toney's employment there would not be immune. The manner of carrying out the disciplinary proceedings against Toney pursuant to executive order No. 81, which carefully detailed all procedures to be followed, is likewise ministerial and operational rather than discretionary, including the failure to dismiss those proceedings and permitting the proceedings to remain pending for some eight months. (See *Ramos* v. *County of Madera, supra,* 4 Cal.3d at pp. 693-695.)

Turning to the qualified privilege prescribed by Civil Code section 47, subdivision 3,[5] we first note that Toney concedes that State was prima facie entitled to protection of the privilege with respect to the press release of April 1, 1970 (see *Maidman* v. *Jewish Publications, Inc.* (1960) 54 Cal.2d 643, 651 [7 Cal.Rptr. 617, 355 P.2d 265, 87 A.L.R.2d 439]; *Howard* v. *Southern Cal. etc. Newspapers* (1950) 95 Cal.App.2d 580, 584 [213 P.2d 399] (disapproved on other grounds in *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 572 [108 Cal.Rptr. 480, 510 P.2d 1032])) but argues that the privilege was destroyed by the implied finding of the jury of actual malice which eliminates the privilege. There is merit in Toney's position.

■ It is established that the privilege is lost upon a showing of "actual malice" on the part of the person publishing the alleged defamatory material. (*Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 29 [81

---

[5]Civil Code section 47 provides in part:
"A privileged publication or broadcast is one made—
" . . . . . . . . . . . . . . .
"3. In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."

Cal.Rptr. 360, 459 P.2d 912]; *Noonan* v. *Rousselot* (1966) 239 Cal.App.2d 447 [48 Cal.Rptr. 817].) Malice has been described as ". . . a feeling of hatred or ill will ' ". . . going beyond that which the occasion apparently justifies . . ." ' and ' " 'different from that which *prima facie* rendered the communication privileged, and being a motive contrary to good morals.' " ' " (*Everett* v. *California Teachers Assn.* (1962) 208 Cal.App.2d 291, 295 [25 Cal.Rptr. 120].)

Looking at the evidence most favorable to Toney, it cannot be said that it was insufficient to support the implied finding of the jury that the press release was issued with actual malice. Such an inference could be legitimately drawn from the summary suspension of Toney by President Falk without consulting with any of the vast number of available witnesses other than Walker and by calling a press conference to announce the so-called unprofessional and criminal conduct of. Toney. In this regard, it is worth noting that no other single investigator or investigating body found any evidence of such misconduct. It can also be inferred from the fact that President Falk, who, when previously presented with the allegation that a faculty member, Cecil Coleman, had actually armed students and encouraged a confrontation with other students, did not press action against Coleman while proceeding as he did against Toney. Such an inference is also quickened by Connelly's finding that the president's action in suspending Toney and not reemploying him was motivated out of racial bias and was the result of differential treatment. Thus, the conclusion is entirely reasonable that the qualified privilege was lost because the president was motivated by ill will going beyond that which the occasion justified. (*Biggins* v. *Hanson* (1967) 252 Cal.App.2d 16, 21 [59 Cal.Rptr. 897].)

Furthermore, it is obvious that the combination of incidents supporting a finding of *intentional* infliction of emotional distress which we have heretofore enumerated also supports a clear inference of actual malice on the part of State's agents.

Finally, it must be pointed out that the verdict in favor of Walker is consistent with liability being imposed upon State if the jury found that Walker had a qualified privilege under Civil Code section 47, subdivision 3. The jury could well have concluded that Walker bore no personal malice against Toney while the remaining agents of State did act out of malice. In this connection, it is noted that Walker was the only witness who testified as to his lack of ill will and animosity toward Toney, and we note that his televised statement regarding the incident

(see Appendix 1) was a paradigm of restrained and objective pedagogical analysis. The instruction given to the jury explicated the theory that Walker was entitled to the privilege if he did not act with actual malice.

The judgment is affirmed. Toney shall recover costs on appeal.

Gargano, J., concurred.

Franson, J., deeming himself disqualified, did not participate therein.

A petition for a rehearing was denied February 19, 1976.

---

APPENDIX 1

At the interview with station KFRE, Walker stated:

"My reaction to the events and probable causes is a complex one and perhaps in a few words, however, I can give you the gist of how I feel. The students, of course, the very angry and up-tight, antagonistic, alienated, as all students are, black students particularly are because of reasons that we are all aware of, many which are very sound and very real. However, because of this, I feel that . . . the real source of the difficulty is not with the students, although of course they should be required to pay whatever price is involved for any legal violations or disciplinary violations of which they are guilty. The real source of the difficulty, I think, there are three: One, is the nature of our times, the unsettling conditions of our times and the natural confusion and anger that these conditions generate. Second, I think it is due partly to the fact that we have on this campus as well as on most of the other campuses a hard-core group of faculty people who are deliberately indoctrinating the students in the attitude that their feelings of an alienation, their feelings of antagonism, are justified because our society, the students are told, is basically corrupt, irredeemable and unjust to the point that it must be destroyed."

APPENDIX 2

The press release of April 1, 1970, reads in part as follows:

"The actions of a group of students and a faculty member toward Acting Dean Phillip Walker of March 19 cannot be tolerated on the campus of Fresno State College.

"On that date between 40 and 50 students and one faculty member detained Dean Walker for nearly two hours against his will, prevented him from leaving his conference room, intimidated, harrassed, insulted and subjected him to verbal obscenities. Later the group barricaded the exits by stacking conference room tables and chairs against the doors to prevent the Dean from being rescued. Nine campus security men were finally successful in rescuing the Dean; however, in so doing one officer received minor head injuries from a thrown ash tray and minor back injuries from a shoved chair.

"According to reports the students and the faculty member were attempting to force Dean Walker to support the reappointment of the Ethnic Studies faculty who were automatically terminated by established college policy at the completion of their academic year.

"The administration, the faculty, and the students of Fresno State College are sensitive to the needs and wants of all minority students. However, the intimidation of administrators and the disruption of normal academic affairs cannot and will not be tolerated.

"In addition to the formal charges that have already been filed with the Fresno County District Attorney, I notified the following students yesterday by mail that they are on interim suspension effective tomorrow, Wednesday, for their participation in the action

of March 19, 1970 against Acting Dean Phillip N. Walker: [students named].

"Also, yesterday by mail, I notified Dr. Joe David Toney, Assistant Professor of Chemistry that he is·being placed on temporary suspension from all classroom activities for 30 days.

"

"Dr. Toney is being placed on temporary suspension for 30 days according to section 43522, Article 2, Subchapter 6, Chapter 5, Title 5 of the California Administrative Code. He is charged with unprofessional conduct as specified by item (b) of Paragraph 24306 of the California State Education Code.

"The charges against Dr. Toney will be handed to the Executive Committee of the Academic Senate for hearing and due process."