**URETHANE SPECIALTIES, INC., Appellant,**

v.

**CITY OF VALDEZ and Bonser Company, Inc., Appellees.**

**No. 4451.**

Supreme Court of Alaska.

Dec. 5, 1980.

Charles K. Cranston, Cranston, Walters, Dahl & Jarrell, and Robert C. Erwin, Hagans, Smith, Brown, Erwin & Gibbs, Anchorage, for appellant.

Kenneth P. Jacobus, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellee City of Valdez.

David H. Call, Call, Haycraft & Fenton, Fairbanks, for appellee Bonser Co., Inc.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

RABINOWITZ, Chief Justice.

Appellant, Urethane Specialties, Inc., is an Alaska corporation which distributes urethane foam insulation. It brought a civil action for defamation and disparagement against the City of Valdez and Bonser Company, Inc., owner of Valdez's only newspaper, the *Valdez Vanguard*, for a warning the city had published in the paper. The superior court granted the motions for summary judgment made by the City of Valdez and Bonser, and this appeal followed. We hold that a portion of the printed warning is protected by the complete defense of truth and, further, that the entire warning is protected by a conditional privilege for comment by inferior administrative officers. Thus, we affirm the superior court's entry of summary judgment.

On August 3, 1977, and for four weeks running, the City of Valdez had the following notice placed in the *Valdez Vanguard*:

—WARNING—

There have been many fly–by–night building companies coming into Valdez selling urethane foam insulation, asphalt spray–on roofing, and other things to improve your homes. These people usually come on Friday and leave on Monday to avoid your building department. All work is required to have a building permit and people know that with their type of operation a permit would be difficult to obtain.

On trailer roofs, urethane foam meets code when properly applied; however, its life span is approximately two years, then it soaks up water and must be scraped off. Urethane foam meets code in buildings only when covered by ⅝", type X gyp board, all electrical in contact must be in conduit.

Even though urethane foam meets code when covered by a fire–resistive barrier, it is a time bomb in disguise, endangering not only the occupants of a building but the firefighters called out to fight it. Urethane burns very rapidly and gives off hydrogen cyanide gas.

Prior to allowing any building company to apply any material to your home or business, demand to have a copy of the building permit issued by the city. If you have any questions please contact your building department at 835–4313. On weekends contact your police department at 835–4560.

The decision to publish the notice was made by the then city manager, William Morrice. The notice was drafted by Tom McAlister, the building inspector and fire marshall for the City of Valdez, with the assistance of John Cerutti, the city engineer. These officials stated, in affidavits, that "[t]he publication was made in the exercise of the fire protection, safety and building inspection functions of the City of Valdez." Publication of the warning was motivated by information suggesting that a number of urethane sprayers were operating in Valdez without obtaining building permits. One operator, clearly intending to evade the permit requirement, inadvertently approached Cerutti in his mobile home to ask if he wanted his roof sprayed; Cerutti's suggestion that a permit should be obtained was not acted upon.

As to the factual basis for the fire hazard presented by urethane, the city, in response to interrogatories, stated in part:

The flammability characteristics of urethane, and the toxic gases which are emitted when it burns, are well known matters of chemistry. Mr. McAlister has attended a seminar in Anchorage put on by the Alaska State Fire Marshall's office at which this subject was discussed.

The city submitted documents from the Urethane Safety Group as well as newspaper articles and other materials, all of which emphasized the highly flammable and toxic nature of urethane.

Urethane Specialties believed that it had lost substantial business in Valdez as a result of the publication of this warning. Initially, Urethane Specialties made a claim to the city council for its alleged losses; this lawsuit followed the city's refusal to pay that claim.

The City of Valdez contends that the warning was true, that it was supported by affidavits, and that these affidavits were uncontroverted. It argues that these facts constitute a complete defense to the suit. Urethane Specialties does not deny that truth as a complete defense to actions for defamation and disparagement, but insists that the truth of the warning was not established.

Truth is generally recognized as a complete defense to actions for defamation and disparagement, since those actions depend on the premise that the harmful statements complained of are false.[1] In *Fairbanks Publishing Co. v. Pitka*, 376 P.2d 190, 192–93 (Alaska 1962) (footnotes omitted), this court said:

The rule that prevails in the great majority of American jurisdictions is that the

1. *See* W. Prosser, The Law of Torts § 116, at 796–98 (4th ed. 1971). *See also Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 489–90, 95 S.Ct. 1029, 1043–44, 43 L.Ed.2d 328, 346 (1975).

truth of a defamatory statement of fact is a complete defense to an action for defamation. That rule is applicable in this case.

This holding was qualified in a footnote as follows:

The general rule has been modified in a few states—by statute in some, and apparently by judicial decision in others—so that elements such as improper motive or malice will prevent truth from being a complete defense. Alaska has no such statute, and since these elements are not present in this case . . ., we do not decide whether to deviate from the majority rule.

*Id.* at 193 n.10 (citation omitted). In the present case, as in *Fairbanks Publishing*, we need not decide whether there is to be a malice exception to this defense since no allegation of malice has been made and no evidence suggesting its presence has been introduced. If every statement in the warning were true, then, this would be a complete defense to Urethane Specialties' allegations and summary judgment would be appropriate. We therefore examine separately the two statements which Urethane Specialties claimed to be defamatory.

The first of these statements is:

There have been many fly–by–night building companies coming into Valdez selling urethane foam insulation, asphalt spray–on roofing, and other things to improve your homes.

Urethane Specialties, an out–of–town firm, alleged that it was encompassed within the ambit of this statement[2] and that it was harmed by the implication that it had acted in violation of the local building code.

We are convinced that there is adequate support in the record for the conclusion that this statement is true. In response to interrogatories, the city stated:

There have been a number of urethane and hot asphalt sprayers operating in the City of Valdez. Examples are John Warden d/b/a Glennallen Insulation, Fiberchem, Inc., Igloo Insulation, and John Donohue. A complaint has been prepared against Mr. Donohue, which was not processed only because he is no longer in Valdez. There are also those sprayers whose identity is unknown to the City. These people generally operated on weekends, and were told to contact the city building department, and some even given application forms. None of the urethane or hot asphalt sprayers, including Urethane Specialties, Inc., obtained a required building permit for any of the work that they were doing in Valdez.

The phrase 'fly–by–night operators' was coined by one of the urethane sprayers who came to the mobile home of the city engineer, John Cerutti, on Sunday, to ask if Mr. Cerutti wanted his roof sprayed. Mr. Cerutti asked the sprayer if he had a building permit, the sprayer replied 'We don't need no building permits—we're fly–by–night operators.' Mr. Cerutti told him to get a permit on Monday, but the sprayer never did.

In summary, none of the sprayers who came to Valdez made requests for building permits. The City was able to contact some of them, and one or two actually got permit applications. No completed applications were filed, however.

Urethane Specialties did not advance any evidence contesting the truth of these statements. It argued before the superior court

---

2. In its complaint, Urethane Specialties alleged:

Although Plaintiff Urethane Specialties, Inc., is not mentioned by name in the 'warning,' by failing to specify the corporate names of those companies described as 'fly–by–night building companies,' Defendant did include Plaintiff Urethane Specialties, Inc., among those companies so described, and by virtue of its corporate name, Plaintiff is included among the building companies described as 'fly–by–night.'

Our resolution of the other issues makes it unnecessary to consider whether this was a sufficient showing of colloquium to associate the allegedly defamatory statements with Urethane Specialties. *See* Restatement (Second) of Torts § 564 (1977). *See also* W. Prosser, The Law of Torts § 111, at 749–51 (4th ed. 1971); *Golden North Airways, Inc. v. Tanana Publishing Co.*, 218 F.2d 612, 618–20 (9th Cir. 1954).

that the activities described are insufficient to support the statement that there were "many fly–by–night building companies" operating in the area. We disagree. The answer to the interrogatory listed four sprayers by name, none of whom had gotten permits. It noted that the term "fly–by–night" was initially used by a sprayer who approached the city engineer to spray his mobile home. This constitutes sufficient factual support for the statement warning of "fly–by–night" operators.

■ The second statement asserted to be defamatory reads:

> Even though urethane foam meets code when covered by a fire–resistive barrier, it is a time bomb in disguise, endangering not only the occupants of a building but the firefighters called out to fight it.

While Urethane Specialties admits that urethane foam is a hazard when improperly installed, it argues that there is nothing in the record to support the conclusion that when properly installed, urethane is a "time bomb in disguise." We hold that there was insufficient evidence presented to the superior court to support the conclusion that this statement was true.

The phrase "time bomb in disguise" was taken from a newspaper article in the *Kodiak Daily Mirror* in which Alaska State Fire Marshall Andre Schalk was quoted as saying:

> Improper uses and placement of polyurethane is suicidal both as a combustible and as a toxic inhalant. Any exposed urethane used on the interior of a boat or a building is a time bomb in disguise. The burning urethane fire spreads so fast that it is almost impossible to outrun it.

Urethane Specialties emphasizes that Schalk's reference is to improperly installed urethane only. No other document before the superior court in regard to this motion for summary judgment supports the conclusion that properly installed urethane foam

is "a time bomb in disguise." The text of the warning goes beyond informing of dangers inherent in the improper installation of urethane and implies that urethane insulation is so dangerous that it should not be used.

Thus, we hold that the defense of truth applies to the first of the allegedly defamatory statements, but that there was insufficient evidence to prove the truth of the second statement.

The City of Valdez also argues that the warning in question comes under the protection of both statutory and common law privileges. First, it asserts that the warning is protected as part of the absolute privilege extended under AS 09.65.070(d)(2) to the exercise by a municipal officer of a discretionary function. AS 09.65.070(d)(2) provides:

> No action for damages may be brought against a municipality or any of its agents, officers or employees if the claim ... (2) is based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty by a municipality or its agents, officers, or employees, whether or not the discretion involved is abused

. . . . .

The City of Valdez argues that the city manager's decision to publish the warning was a discretionary function protected by AS 09.65.070(d)(2). Urethane Specialties concedes that the decision to publish a warning concerning the unsafe use of urethane is a policy decision and represents the exercise of a discretionary function, but argues that the city's action in issuing the broad warning under consideration here was negligent and thus unprotected.

Alaska's statutes contain a provision concerning state officials that is analogous to AS 09.65.070(d)(2). This statute, AS 09.50.-250,[3] which grants immunity for discretionary governmental activities, has been discussed several times in this court's opinions.

---

**3.** AS 09.50.250 provides in relevant part:

[N]o action may be brought under this section if the claim

(1) ... is an action for tort, and based upon the exercise or performance or the fail-

ure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused . . . .

In *State v. Abbott*, 498 P.2d 712, 717–22 (Alaska 1972), we addressed the problem of interpretation of the discretionary function exception in a waiver of sovereign immunity context. There we look to a parallel exemption provision contained in the Federal Tort Claims Act, 28 U.S.C.A. § 2680(a), and to the federal case law interpreting that provision. After a review of the various conflicting interpretations of this exception by the federal courts, we determined that our primary concerns should be with the basic policies underlying the exception's creation and the significance of the distinction between planning and operational decisions by government. Our conclusion was that the state's failure to maintain a curve on a highway during treacherous winter conditions subjected the state to liability:

> Turning then to the specific circumstances of this case, the lower court found the state and its employees negligent in failing to exercise reasonable care to maintain the curve where the accident occurred. We have concluded that the trial court was correct in holding that such maintenance was not within the discretionary function exception. Although it is true, as the state contends, that the district engineer's decision as to how many men and how much equipment were necessary to maintain this particular stretch of highway involved a certain amount of planning and discretion, it is not the kind of broad policy decision at which the exception, as interpreted by the above authorities, is aimed. Once the initial policy determination is made to maintain the highway through the winter by salting, standing and plowing it, the individual district engineer's decisions as to *how* that decision should be carried out in terms of men and machinery is made at the operations level; it merely implements the basic policy decision. Once the basic decision to maintain the highway in a safe condition throughout the winter is reached, the state should not be given discretion to do so negligently. The decisions at issue in this case simply do not rise to the level of governmental policy decisions calling for judicial restraint. Under these circumstances the discretionary function exception has no proper application.

*Id.* at 722 (footnotes omitted).

In *State v. I'Anson*, 529 P.2d 188, 193 (Alaska 1974), we reaffirm the "adoption in *Abbott* of the planning–operational test, within an analytical framework which is sensitive to the policies underlying the discretionary function or duty exception of Alaska's Tort Claims Act." *See also Carlson v. State*, 598 P.2d 969, 972–73 (Alaska 1979). In *I'Anson*, we concluded that the proper marking and striping of a portion of the Seward Highway was an exercise of an operational function and, thus, that it did not fall within the protection of this exception.

More recently, in *Adams v. State*, 555 P.2d 235, 243 (Alaska 1976) (footnote omitted), this court noted:

> We have declined to use a mechanical or semantic test in determining whether a particular function or duty is discretionary; instead, we must weigh the policy considerations behind the labeling.

That case concerned a claim that the state failed to abate a serious fire hazard it had discovered during an inspection of the Gold Rush Hotel. We found that:

> [T]he discretionary act could be described as the decision to inspect the Gold Rush Hotel; the negligent performance of that inspection would then be an operational or ministerial act and thus not immune.

*Id.* at 244.

■ We agree with the city's view in the present case that the decision by the city manager to issue the questioned warning was an exercise of a discretionary function. However, the fact that issuance of the warning was a discretionary function does not automatically extend discretionary immunity to the city in regard to the warning's content.

A recent California decision is analogous to the case at bar. In *Toney v. State*, 54 Cal.App.3d 779, 126 Cal.Rptr. 869 (Cal.App. 1976), the court was faced with a press

release alleged to have included defamatory statements regarding the plaintiff. After reviewing the California cases construing the discretionary function clause, the court concluded:

> Applying the foregoing criteria to the facts of the case at bench, we believe the conclusion to be inescapable that the decision to issue press releases concerning events on a college campus 'comprises the resolution of policy considerations, is a discretionary act and one which is properly entrusted to the authority of a coordinate branch of government. However, the timing of any particular release, the content of any particular release, and the manner in which a release is made constitute the implementation of the policy, more properly described as the operational aspect of the policy, and are not entitled to the protection of the discretionary statute. It follows that the State was not entitled to the discretionary immunity by reason of the content of the press release of April 1, 1970.

*Id.* at 878. We similarly conclude that the City of Valdez is not protected by the discretionary immunity provided in AS 09.65.-070(d)(2) as to the content of this particular warning.

■ The City of Valdez makes the further assertion that common law privileges pertaining to matters of public interest protect its issuance of the warning in question. The common law provides for privileges in various situations in which public policy requires that a speaker be accorded immunity for the making of defamatory statements.[4] In this regard, we said in *Fairbanks Publishing Co. v. Francisco*, 390 P.2d 784, 793 (Alaska 1964):

> Numerous conditional or qualified privileges are accorded based upon a public policy which recognizes that it is essential that true information shall be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons, or the interests of the public. . . . Each such privilege is conditional upon the existence of a state of facts which make it in the public interest to protect the person speaking or writing, even though an individual may be defamed as a result.

The *Restatement (Second) of Torts* § 598A (1977) describes the privilege applicable here as follows:

> An occasion makes a publication conditionally privileged if an inferior administrative officer of a state or any of its subdivisions makes a defamatory communication required or permitted in the performance of his official duties.

■ We think that the city manager was permitted, if not required, to act in the public interest by taking reasonable action to prevent the creation of safety hazards. Here, city employees were informed of the operations of urethane sprayers in Valdez who were conducting their enterprises without obtaining the necessary permits. It is understandable that such information would cause concern that urethane foam was being improperly installed. Further, the highly flammable character of urethane and its extreme toxicity once ignited are obvious causes for concern on the part of the fire marshall. We hold that this warning to the general populace pertaining to a matter of public health and safety is protected by the privilege extended to administrative officers under *Restatement (Second) of Torts* § 598A, which we adopt as appropriate to situations like the one under consideration.[5]

■ This privilege is conditional, and its protection can be lost through abuse. *Restatement (Second) of Torts* § 600 (1977) describes abuse as follows:

> [O]ne who upon an occasion giving rise to a conditional privilege publishes false and

---

4. The common law privileges applicable to actions in defamation are generally also available for actions for disparagement. *See generally* W. Prosser, The Law of Torts § 128, at 924 (4th ed. 1971).

5. Our adoption of this section of the *Restatement* is not intended as a signal to every minor state official that he or she is given carte blanche to comment on matters of public interest.

defamatory matter concerning another abuses the privilege if he

    (a) knows the matter to be false, or

    (b) acts in reckless disregard as to its truth or falsity.

This is also the definition of "malice" that has been adopted by the United States Supreme Court in the defamation context. *National Association of Letter Carriers v. Austin*, 418 U.S. 264, 281, 94 S.Ct. 2770, 2779, 41 L.Ed.2d 745, 760 (1974). In the instant case, there was no evidence before the superior court suggesting that the city's warning was issued with a knowing or reckless disregard for the truth of the statements it contained. Therefore, we hold that summary judgment for appellees was appropriate on the basis of this conditional privilege.[6] Thus, we need not determine whether the City of Valdez is also protected by virtue of a constitutional privilege.

The judgment of the superior court is AFFIRMED.[7]

BOOCHEVER, J., not participating.

---

**6.** If the author of a newspaper article is privileged in making the statement, then the newspaper that publishes it is also protected. Restatement (Second) of Torts § 612(1) (1977) provides:

> One who provides a means of publication of defamatory matter published by another is privileged to do so if
>
>     (a) the other is privileged to publish it, or

>     (b) the person providing the means of publication reasonably believes the other is privileged to publish it.

**7.** The City of Valdez has raised an issue of whether punitive damages can be awarded against it. As Urethane Specialties correctly notes, no punitive damages were awarded against the city and thus the issue is not before the court.