ASPEN EXPLORATION CORPORA-
TION and R.V. Bailey, Appellants,

v.

Bill SHEFFIELD, Appellee.

No. S–1277.

Supreme Court of Alaska.

June 19, 1987.

Harris Saxon, Mark E. Wilkerson, Guess & Rudd, Anchorage, for appellants.

Theodora Accinelli, Olof K. Hellen, Hellen, Partnow & Condon, Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

Aspen Exploration Corporation and its president, R.V. Bailey (hereinafter collectively referred to as Aspen), challenge the dismissal of their complaint against former Governor Bill Sheffield. Aspen contends that the trial court erred in three respects: first, by misapplying the standard for determining the sufficiency of its complaint; second, by holding that the doctrine of executive immunity justified dismissal of its action; and third, by awarding Governor Sheffield attorney's fees.

We conclude that the trial court applied the correct standard in determining the sufficiency of Aspen's complaint and correctly dismissed Aspen's four claims for "wrongful interference." As to these, Sheffield was absolutely immune. We further conclude, however, that Aspen's defamation claim was improperly dismissed. As to this cause of action, Sheffield is only entitled to qualified immunity. Thus, Aspen must be allowed the opportunity to prove its claim.

I

In June 1985 Aspen filed suit against Governor Sheffield in the latter's "individual capacity," seeking injunctive relief and $15 million in damages. Aspen's complaint alleged five separate causes of action, each one a common law tort:

(1) wrongful interference with prospective economic advantage;

(2) wrongful interference with prospective contractual relations;

(3) wrongful interference with existing contracts between the state and Aspen;

(4) wrongful interference with government process; and

(5) defamation.

The crux of Aspen's complaint was that Governor Sheffield was personally liable for these alleged torts, because he had acted outside the scope of his official duties and authority as governor, by "knowingly, intentionally and maliciously" ordering the Commissioner of the Department of Natural Resources (DNR) to reject Aspen's application for offshore prospecting permits (permit applications), and by intentionally defaming its business reputation.

Pursuant to Civil Rule 12(b)(6) Sheffield moved to dismiss Aspen's complaint on the grounds that actions for damages against the governor, personally, are barred by the doctrine of official immunity (referred to by the parties as executive immunity). Superior court judge Karen L. Hunt granted Sheffield's motion, ordering Aspen's complaint dismissed with prejudice. In her oral findings, Judge Hunt found, as a matter of law, that Governor Sheffield's alleged actions were within the scope of the governor's authority and discretionary in nature. Based upon these determinations she held that the governor was immune from "personal suit seeking personal compensation."

Subsequently, Aspen filed a motion for reconsideration, to determine whether the trial court's decision was based on a defect in the complaint or solely upon the doctrine of official immunity. Aspen also requested leave to amend its complaint.[1] The trial

---

1. Aspen had informally requested that it be allowed to amend its complaint at the hearing on

court denied Aspen's motion without comment. Later, Governor Sheffield filed a motion for attorney's fees and costs, and the trial court awarded him costs and $12,232 for his attorney's fees. This appeal followed.

## II

■ Aspen first contends that the trial court misapplied the standard for determining the sufficiency of its complaint. Aspen argues that under Alaska's rule of permissive pleading their complaint is sufficient to state a claim.

Under the now well established standards for determining the sufficiency of a complaint,[2] it does not appear beyond doubt that the Aspen could prove no set of facts that would entitle it to relief.[3] Thus, its complaint should not, as Aspen contends, have been dismissed for insufficiency. Our reading of the trial court's decision, however, convinces us that Aspen's complaint was not dismissed for this reason. Instead, the court dismissed Aspen's entire cause of action because it believed the action was barred by the affirmative defense of official immunity.

We have recognized that a complaint is subject to dismissal under Rule 12(b)(6) when an affirmative defense appears clearly on the face of the pleading. *Martin v. Mears*, 602 P.2d 421, 428 (Alaska 1979) (statute of frauds); *Nizinski v. Currington*, 517 P.2d 754, 757 n. 6 (Alaska 1974) (absolute privilege for defamatory testimony by a witness in a judicial proceeding). *Accord Shannon v. City of Anchorage*, 429 P.2d 17, 20 n. 10 (Alaska 1967) (Rabi-

nowitz, J., concurring) (dismissal under Rule 12(b)(6) permitted where pleader makes allegations which show on the face of the complaint an insuperable bar to relief). In such situations, "the claim is adequately stated, but in addition to the claim the complaint includes matters of avoidance that effectively vitiate the pleader's ability to recover on the claim." 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1357, at 606 (1969). In other words, the complaint has a built-in defense.

Aspen sued the Governor of Alaska for action taken under the color of office. Merely because Governor Sheffield was sued in his individual capacity does not change the fact that he was acting as a state official when he engaged in the acts for which Aspen seeks relief. The trial court dismissed Aspen's complaint based upon its interpretation of this built-in defense. Consequently, resolution of this case is not found within the confines of Rule 12(b)(6) but rather in an analysis of the doctrine of official immunity.[4]

## III

The trial court held that Governor Sheffield's actions were within the scope of his authority as governor and were discretionary in nature. Thus, it concluded that he was immune from personal tort liability. Aspen argues that the court's decision has two major flaws. First, Aspen contends that the doctrine of official immunity is not applicable, because Governor Sheffield's actions were beyond his authority as governor and were not discretionary in nature. Second, Aspen asserts that our prior deci-

Governor Sheffield's motion to dismiss. In its motion for reconsideration, Aspen set forth its proposed amendments.

2. *See* Alaska R.Civ.P. 8; *Knight v. American Guard & Alert,* 714 P.2d 788, 791 (Alaska 1986); *Martin v. Mears,* 602 P.2d 421, 427 (Alaska 1979); *Schaible v. Fairbanks Medical & Surgical Clinic,* 531 P.2d 1252, 1255–57 (Alaska 1975); *Dworkin v. First National Bank of Fairbanks,* 444 P.2d 777, 779 (Alaska 1968). *See generally* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1357 (1969) (hereinafter Wright & Miller); 2A J. Moore & J. Lucas, *Moore's Federal Practice,* ¶ 12.07 [2–5] (2d ed. 1985).

3. This is true with or without Aspen's proposed amendments. Consequently, we need not determine whether the trial court erred by not allowing Aspen to amend its complaint.

4. Aspen argues that merely alleging that Sheffield's actions were not discretionary acts within the scope of his authority is sufficient to prevent its complaint from being dismissed. This argument is wholly without merit. Such allegations are mere conclusions of law, not deemed admitted in resolving a Rule 12(b)(6) motion. *Dworkin,* 444 P.2d at 779. Thus, the trial court properly made its own determination as a matter of law on these questions.

sions establish a rule of qualified, rather than absolute, immunity.

The ruling below was grounded upon the trial court's reading of our decisions in *Earthmovers of Fairbanks v. State*, 691 P.2d 281 (Alaska 1984); *State v. Stanley*, 506 P.2d 1284 (Alaska 1973); and *Bridges v. Alaska Housing Authority*, 375 P.2d 696 (Alaska 1962).[5]

In *Bridges*, we held that the officers of the Alaska Housing Authority were immune from personal liability for the destruction of the plaintiff's building under an illegal declaration of taking, because they were acting within the scope of their official duties and merely made a mistake in the exercise of a discretionary function. 375 P.2d at 702. We observed:

> [The Housing Authority officers] are immune from civil liability for this action under the well recognized rule that affords such protection to a public officer, acting within the scope of his official duties, for damages caused by a mistake by him in the exercise of judgment or discretion, or because of an erroneous interpretation and application of the law.

*Id.*

Eleven years later in *State v. Stanley*, 506 P.2d at 1292, we held that an official of the Alaska Department of Fish and Game *was not* immune from personal liability for the negligent performance of a ministerial act. The *Stanley* court reasoned:

> While a public employee ... may not be held liable for acts done in line of official duty involving a mistake in judgment or discretion, or because of erroneous inter-

pretation and application of law, it is well established that the immunity from suit *does not apply to the negligent performance of acts not involving such discretionary judgment-policy decisions.*

*Id.* at 1292 (emphasis added) (footnotes omitted).

Finally, in *Earthmovers*, we held that a state trooper who ordered the speed limit reduced on a road under construction, because of perceived hazardous conditions, was immune from personal liability. 691 P.2d at 283–84. Although *Earthmovers* refers to both statutory and common law immunity, a close reading of the case shows that we applied statutory (sovereign) immunity to the claims against the state, and common law (official) immunity to the claims against the individual officer. *Id.* at 285 (Rabinowitz, J. concurring).[6]

In this appeal both sides argue that *Bridges*, *Stanley*, and *Earthmovers* establish a clear cut test for official immunity in Alaska. They differ, however, on what the test is. Aspen contends that in order to be entitled to immunity, a public official's actions must be (1) within the scope of his authority; (2) discretionary in nature; and (3) done in good faith. Governor Sheffield, on the other hand, argues that the governor is entitled to immunity if his actions (1) were not beyond the outer perimeter of his authority; and (2) involved an exercise of discretion. Motive, Governor Sheffield asserts, is totally irrelevant. We cannot agree with either party's position.[7]

> We said in *Stanley* that State employees are immune, under the *common law*, for mistaken "discretionary judgment-policy decisions." ... Holding [the Trooper] personally liable ... would be inconsistent with *Stanley*.
>
> *Earthmovers*, at 285. (Rabinowitz, J., concurring) (emphasis added) (citations omitted).

---

**5.** We also considered the doctrine of official immunity in *State v. Haley*, 687 P.2d 305, 315–18 (Alaska 1984). In that case, however, we dealt solely with the immunity of public officials for constitutional torts, holding that two state officials were immune from liability for firing a state employee in violation of her constitutional rights. *Id.* at 315–18. Applying *federal law*, we reasoned that the officials were entitled to assert the defense of qualified immunity for the constitutional tort because they had acted in good faith in the performance of a discretionary duty. *Id.* at 316–17. Aspen raises no allegations of constitutional deprivations, thus *Haley* is inapposite here.

**6.** Justice Rabinowitz noted:

**7.** As used here, the term "public officials" is meant to refer only to administrative officials (i.e. members of the executive branch of government or members of bodies which do not belong strictly to any of the three traditional branches of government). It does not include judicial officers or legislators. For discussion of the immunity of these public servants, *see* *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (judicial immunity);

We believe that the following two-step analysis is appropriate. First, it must be determined whether or not the doctrine of official immunity applies to the defendant's alleged conduct. If it does, the scope of that immunity must then be ascertained. That is, we must determine whether the official should be entitled to absolute or only qualified immunity. This requires us to focus on the particular conduct and circumstances that give rise to the claim of liability.[8]

The applicability and scope of official immunity raise only questions of law. Thus, in applying the above analysis we are free to substitute our own judgment for that of the trial court. With this in mind, we turn to the case at bar.

### A

The trial court determined, as a matter of law, that Governor Sheffield was acting within the scope of his authority as governor. Aspen contests this determination. In effect, Aspen argues that any intentional, malicious act is *ipso facto* beyond the scope of the governor's authority. Therefore, Aspen contends, since its complaint alleged that Governor Sheffield's actions were "intentionally and maliciously" done he, thus, acted beyond the scope of his authority. We disagree.

The flaw in Aspen's argument is that it proves too much. As the United States Supreme Court has noted:

it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him.

*Barr v. Matteo*, 360 U.S. 564, 572, 79 S.Ct. 1335, 1340, 3 L.Ed.2d 1434, 1441–42 (1959) (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950)). Otherwise stated, as long as Governor Sheffield's actions were, on their face, within the scope of his authority, the fact that Aspen alleges that they were performed with unlawful intent is irrelevant to this part of our analysis.[9]

We know of few, if any, government officials who are authorized to commit torts as a part of their line of duty. But to separate the activity that constitutes the wrong from its surrounding context—an otherwise proper exercise of authority—would effectively emasculate the immunity defense. Once tortious acts are excluded from an exercise of authority, only innocuous activity remains to which immunity would be available. Thus, the defense would apply only to conduct for which it would not be needed.

Viewed in this light, it is clear that Sheffield's actions were within the scope of his authority as governor. The governor is the supervisor of all state executive departments. Alaska Const. art. III, § 24. The DNR is a department of the executive branch. AS 44.17.005(10). Thus, it naturally follows that the DNR and its department head, the Commissioner, are under the direct supervision of the governor. The governor is also empowered by statute and regulation to take an active role in

---

*Kerttula v. Abood,* 686 P.2d 1197 (Alaska 1984) (legislative immunity); *State v. Dankworth,* 672 P.2d 148 (Alaska App. 1983) (legislative immunity); *see generally* J. Block, *Stump v. Sparkman and the History of Judicial Immunity* Duke L.J. 879 (1980); R. Gray, *Private Wrongs of Public Servants,* 47 Calif.L.Rev. 303, 319–22 (1959) (hereinafter Gray, *Private Wrongs* ).

**8.** The trial court appears to have assumed that merely because it found that Governor Sheffield had acted within the scope of his authority in the performance of a discretionary function that immunity naturally followed.

**9.** Sheffield's intent becomes relevant only when determining the scope of the immunity, and even then, only under a rule of qualified immunity.

matters relating to the disposal of state lands and resources. *See* AS 46.40; 6 AAC 50.010–.190. Consequently, it was well within the governor's supervisory authority for him to order his subordinate to reject Aspen's permit applications.

The same is true as to the allegedly defamatory statements made by Governor Sheffield. The governor is the chief executive officer of the state in whom the Alaska Constitution vests all executive powers. Alaska Const. art. III, § 1. Without doubt, the authority to speak out on matters of public interest or concern is part and parcel of this broad power. The development of Alaska's natural resources through the state's offshore mining program is a matter of considerable public interest. The economic, environmental and social impacts of allowing offshore prospecting in Cook Inlet was and continues to be a matter of great public debate.[10] We believe it would be an unduly restrictive view of the governor's scope of authority to hold that a statement in respect to a matter of such public interest and debate is not action in the line of duty. The critical inquiry is not whether the governor is authorized to make defamatory remarks, but whether he has the authority to engage in the underlying conduct out of which the alleged defamation arises. Such authority, without question, exists here.[11]

### B

Aspen also contests the trial court's determination that Governor Sheffield's actions were discretionary in nature. Essentially, Aspen argues that Governor Sheffield's actions were not basic policy formulation but only the execution or implementation of a policy decision, and thus the actions are not immune.

Aspen's interpretation of what constitutes a discretionary function for the purposes of official immunity is too broad. Essentially, Aspen's position is that what constitutes a discretionary function for the purposes of sovereign immunity also constitutes a discretionary function for the purposes of official immunity. The two standards, however, are not the same.

We have adopted a "planning-operational" test for determining what type of actions are discretionary for the purposes of the sovereign immunity provisions of AS 09.50.250. *Division of Corrections v. Neakok,* 721 P.2d 1121, 1132–33 (Alaska 1986); *Japan Air Lines v. State,* 628 P.2d 934, 937 (Alaska 1981). Under this test, "only decisions that rise to the level of basic planning or policy formulation will be considered discretionary." *Neakok,* 721 P.2d at 1133. *See also Johnson v. State,* 636 P.2d 47, 64 (Alaska 1981); *State v. I'Anson,* 529 P.2d 188, 193 (Alaska 1974); *State v. Abbott,* 498 P.2d 712, 717–22 (Alaska 1972).

When discussing official immunity, however, we have not relied upon this "operational-planning" distinction. Instead, we have spoken of discretionary acts as those involving a mistake in "judgment or discretion, or because of an erroneous interpretation and application of the law," *Bridges,* 375 P.2d at 702, or "discretionary judgment-policy decisions." *Stanley,* 506 P.2d at 1292. *See also Earthmovers,* 691 P.2d at 285 (Rabinowitz, J, concurring). Moreover, in *Haley* we defined discretionary acts as "those requiring 'personal deliberation, decision and judgment,'" while ministerial acts were described as acts amounting "'only to obedience of orders, or the performance of a duty in which the officer is left with no choice of his own.'" 687 P.2d 305, 316 (Alaska 1984) (quoting W. Prosser, *Handbook of The Law of Torts,* § 132 at 988–89 (4th ed. 1971)).

The difference is more than mere semantics; it reflects the differing policy considerations which underlie the two forms of immunity.[12]

---

**10.** Aspen's complaint itself points out that in 1984 alone, there were eight public hearings held on the proposed offshore prospecting permit disposal in Cook Inlet.

**11.** This is not to say that such remarks do not constitute an abuse of authority. However, an abuse of authority is not synonymous with a lack of authority.

**12.** As we have observed on prior occasions:

At issue here are two actions taken by Governor Sheffield, his ordering the rejection of Aspen's permits and the making of allegedly defamatory statements. While the trial court appears to have treated these actions collectively, we believe each must be examined in its own right.

The first action which Aspen contends was not discretionary in nature is Governor Sheffield's order that Aspen's permit applications be rejected. Aspen argues that "a specific decision rejecting [permit applications] is not a policy or discretionary action but a nondiscretionary action which must be implemented in accordance with the standards contained in the statutes and regulations."

Aspen mischaracterizes the action which is the actual subject of our inquiry: the issue to be determined here is not whether Aspen's permit applications were improperly rejected, but whether Governor Sheffield's actions in ordering their rejection was an act requiring "personal deliberation, decision and judgment." We conclude that it was.

The governor, as chief executive officer of the state, is vested with broad powers. With this power comes a wide array of responsibilities and duties. And, the "broader the range of responsibilities and duties ... the wider the scope of discretion it entails." *Barr*, 360 U.S. at 573, 79 S.Ct. at 1340, 3 L.Ed.2d at 1442. In ordering the rejection of Aspen's permit applications, Sheffield was engaged in an exercise of "supervisory authority" over his subordinates. When and whether to supervise subordinates, and how much supervision is required, are fundamental policy determinations that must be made by any governor. The exercise of such authority, by its very nature, involves personal deliberation and judgment. It is, therefore, discretionary in nature.

Aspen also contends that a defamatory statement can "at least [in] some instances ... be considered nondiscretionary action[ ]." It fails to specify, however, whether Governor Sheffield's remarks in this case constitute one of those instances. In fact, Aspen's entire argument on this question consists of a two sentence paragraph without reference to authority of any kind.

We have made it clear that arguments given no more than cursory treatment in the brief will not be considered on appeal. *See Craig Taylor Equipment v. Pettibone Corp.*, 659 P.2d 594, 596 n. 1 (Alaska 1983); *State v. O'Neill Investigations*, 609 P.2d 520, 528 (Alaska 1980); *Lewis v. State*, 469 P.2d 689, 691–92 n. 2 (Alaska 1970); *Pedersen v. State*, 420 P.2d 327, 332 n. 5 (Alaska 1966). Consequently, because we find no per se error in the trial court's determination, we decline to address this issue.[13]

In sum, we conclude that the trial court's determinations that Governor Sheffield's actions were within the scope of his authority and discretionary in nature are correct. Thus, the doctrine of official immunity is applicable to the facts of this case. Our analysis does not end here, however. We must now determine what the scope of

---

We have declined to use a mechanical or semantic test in determining whether a particular function or duty is discretionary; instead we must weigh the policy considerations behind the labeling.

*Adams v. State*, 555 P.2d 235, 243 (Alaska 1976) (footnote omitted). *See also Urethane Specialties v. City of Valdez*, 620 P.2d 683, 688 (Alaska 1980) (quoting *Adams*).

13. We are not unmindful of our decision in *Urethane Specialties v. City of Valdez*, 620 P.2d 683 (Alaska 1980). In that case we held that, for the purposes of sovereign immunity, the decision by a city manager to issue an allegedly defamatory press release was an exercise of a discretionary function. *Id.* at 688. We further concluded, however, that:

[T]he timing of any particular release, the content of any particular release, and the manner in which a release is made constitute the implementation of the policy, more properly described as the operational aspect of the policy, and are not entitled to the protection of the discretionary statute.

*Id.* at 689 (quoting *Toney v. State*, 54 Cal.App.3d 779, 793, 126 Cal.Rptr. 869, 878 (Cal.App.1976)). Because of the different policy considerations underlying sovereign and official immunity, in the absence of any persuasive argument or compelling reason to the contrary, we are not inclined to extend the *Urethane Specialties* rationale to cover statements made by the state's chief executive officer.

immunity to be afforded Governor Sheffield should be. This, as previously noted, is an issue we have not fully considered in any of our prior decisions.

## IV

██ The immunity of public officials is a relatively recent phenomenon. Traditionally, the common law did not distinguish between public officials and private individuals for purposes of personal tort liability.[14] 5 F. Harper, F. James & O. Gray, *The Law of Torts* § 29.8 at 653–54 (2d ed. 1986) (hereinafter 5 Harper, James & Gray). In fact, courts often imposed a stricter standard of care on public officials, holding them personally liable not only for intentional torts but even for the consequences of simple non-negligent mistakes. *See e.g., Miller v. Horton,* 152 Mass. 540, 26 N.E. 100 (1891). *See generally* 5 Harper, James & Gray, § 29.8 at 654–55 & n. 4; E. Keefe, *Personal Tort Liability of Administrative Officials,* 12 Fordham L.Rev. 130, 132–34 (1943) (hereinafter Keefe, *Administrative Officials* ) and cases cited therein.

Beginning with *Spalding v. Vilas,* 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896), however, the federal courts began to afford absolute immunity from civil liability to public officials acting within the scope of their legal authority. *See, e.g., Cooper v.*

*O'Conner,* 99 F.2d 135 (D.C.Cir.), *cert. denied,* 305 U.S. 642, 59 S.Ct. 146, 83 L.Ed. 414 (1938). *See generally* Gray, *Private Wrongs,* at 337 & nn. 216–23 and cases cited therein. At first limited only to high ranking officers, absolute immunity was subsequently expanded to cover the discretionary acts of lower echelon officials and assorted bureaucrats. *See, e.g., Barr,* 360 U.S. at 572 & n. 9, 79 S.Ct. at 1340, 3 L.Ed.2d at 1442 & n. 9 (1959); *Gregoire,* 177 F.2d at 581.

The federal court's abrogation of the traditional common law rule was grounded in considerations of public policy. For reasons not all together clear it became generally recognized that public officials would be unduly hampered, deterred and intimidated in the discharge of their duties if not protected from private liability. *See generally* Prosser, § 132 at 987; 63A Am.Jur.2d, § 358 at 924–25. Accordingly, the primary rationale for the rule of absolute immunity is "the promotion of fearless, vigorous and effective administration of government."[15] *E.g., Barr,* 360 U.S. at 571, 79 S.Ct. at 1339, 3 L.Ed.2d at 1441.

Thus, today the general rule in the federal courts, and a minority of states, is that a public official is absolutely immune from common law tort liability[16] for any discre-

---

**14.** This rule had its origin in the Anglo-American common law principle that "no man is above the law." As the eminent British constitutional scholar, A.V. Dicey boasted: "[w]ith us every official from the Prime Minister down to a constable or a collector of taxes, is under the same responsibility for every act done without legal justification as any other citizen." A.V. Dicey, *The Law of the Constitution,* 193 (10th ed. 1959).

**15.** Other policy considerations variously identified as justifying absolute immunity include: (1) the injustice of subjecting to liability an officer who is required by the legal obligations of his position to exercise discretion; (2) the deterrent effect which the threat of personal liability might have on those who are considering entering public service; (3) the drain on valuable time caused by such actions; (4) the feeling that the ballot and removal procedures are more appropriate methods of dealing with misconduct in public office. *See Wood v. Strickland,* 420 U.S. 308, 320, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975); *Scheur v. Rhodes,* 416 U.S. 232, 240, 94 S.Ct. 1683, 1688, 40 L.Ed.2d 90,

99 (1974); *Wallen v. Domm,* 700 F.2d 124, 126 (4th Cir.1983). *See generally,* Prosser, § 132, at 987–92; 63A Am.Jur.2d, § 358 at 924–25; Keefe, *Administrative Officials,* at 131.

The arguments used by courts to justify absolute immunity have not gone uncriticized. Professor Gray calls them "a wry blend of fairy tale and horror story." Gray, *Private Wrongs,* at 339. Justice Brennan has referred to them as "gossamer web[s] selfspun without a scintilla of support to which one can point." *Barr,* 360 U.S. at 590, 79 S.Ct. at 1349, 3 L.Ed.2d at 1451 (Brennan, J., dissenting). We concede that this rule does seem to indicate a judicial preference for Joyce and Beckett over Lardner and Twain.

**16.** This rule pertains only to immunity from common law torts. The general rule for both federal and state officials as to constitutional torts is qualified immunity. *See e.g., Haley,* 687 P.2d at 315–18 (discussing federal law of immunity as applied to constitutional torts). *See generally* Comment, *Immunity: Eliminating the Subjective Element from the Qualified Immunity Standard in Actions Brought Against Government Officials,* 22 Washburn L.Rev. 577 (1983).

tionary act done within the scope of the official's authority without regard to motive. *See, e.g., Wallen v. Domm,* 700 F.2d 124, 126 (4th Cir.1983); *Lawrence v. Acree,* 665 F.2d 1319, 1325 (D.C.Cir.1981). In other words, immunity applies whether the allegedly tortious conduct was done maliciously, corruptly or in bad faith.[17] *Id. See also Butz v. Economou,* 438 U.S. 478, 495, 98 S.Ct. 2894, 2905, 57 L.Ed.2d 895, 908–09 (1978); *Barr,* 360 U.S. at 575, 79 S.Ct. at 1341, 3 L.Ed.2d at 1443; *Spalding,* 161 U.S. at 498, 16 S.Ct. at 637, 40 L.Ed. at 785–86; *Gregoire,* 177 F.2d at 581. *See generally* 63A Am.Jur.2d, § 360, at 926; Restatement (Second) of Torts, § 895D (1979). Courts applying this rule have determined that the proper and effective administration of public affairs simply outweighs redress of the occasional wrong caused by an official during activity otherwise within the official's authority.

Following the lead of the federal courts, state courts also began to recognize common law immunity for public officials. *See, e.g., Wadsworth v. Town of Middletown,* 94 Conn. 435, 109 A. 246, 248 (1920); *Hedgepeth v. Swanson,* 223 N.C. 442, 27 S.E.2d 122, 123 (1943). *See generally* Gray, *Private Wrongs* at 342–47. However, in sharp contrast to the federal courts, the overwhelming majority of states adopted a rule of qualified immunity. *See generally* Gray, *Private Wrongs,* at 342 & n. 246 (citing 29 state cases adopting a rule of qualified immunity). This rule remains the majority view among the states today.[18]

Under a rule of qualified immunity, a public official is shielded from liability only when discretionary acts within the scope of the official's authority are done in good faith and are not malicious or corrupt. *E.g., Trimble v. City and County of Denver,* 697 P.2d 716, 729 (Colo.1985). In other words, "malice, bad faith or corrupt motive transforms an otherwise immune act into one from which liability may ensue."[19] *Shellburne, Inc. v. Roberts,* 238 A.2d 331, 338 (Del.1968). Courts applying this rule reason that:

> qualified [immunity] is sufficient to protect the honest officer who tries to do his duty ... official immunity should not become a cloak for malicious, corrupt, and otherwise outrageous conduct on the part of those guilty of intentional abuse of power with which they are entrusted by the people; and that the burden and inconvenience to the officer of an inquiry into his motives is far outweighed by the possible evils of the deliberate misconduct.

Prosser, § 132 at 989. *See also Grimm v. Arizona, Board of Pardons and Paroles,* 115 Ariz. 260, 564 P.2d 1227, 1231–33 (1977); *Medeiros v. Kondo,* 55 Hawaii 499, 522 P.2d 1269, 1271 (1974).

The split of authority among the various jurisdictions can be largely attributed to the conflicting policy considerations inherent in the doctrine.[20] On the one hand,

The one exception established to date is the president, who is absolutely immune from constitutional torts. *See Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982).

**17.** Absolute immunity has been described as "the right to be free, not only from the consequences of the litigation's results, but from the burden of defending oneself all together." 63A Am.Jur.2d § 360, at 926. Otherwise stated, absolute immunity immunizes an official from suit, as well as damages.

**18.** *See Hendrix v. City of Topeka,* 231 Kan. 113, 643 P.2d 129, 134–35 (1982); *Thompson v. Huecker,* 559 S.W.2d 488, 494–97 (Ky.App.1977); *Mackerron v. Madura,* 474 A.2d 166, 167 (Me. 1984); *Koch v. Grimminger,* 192 Neb. 706, 223 N.W.2d 833, 834–35 (1974); *Neal v. Donahue,* 611 P.2d 1125 at 1129–31 (Okl.1980); *Dubree v.*

*Commonwealth,* 393 A.2d 293, 293–96 (Pa.1978); *Sioux Falls Construction v. City of Sioux Falls,* 297 N.W.2d 454, 458–59 (S.D.1980); *Clipse v. Gillis,* 20 Wash.App. 691, 582 P.2d 555, 557–58 (1978); *Lister v. Board of Regents of University of Wisconsin System,* 72 Wis.2d 282, 240 N.W.2d 610 at 620–22.

**19.** Thus, qualified immunity is said to extend "only to immunity from damages not from suit." 63A Am.Jur.2d § 360, at 926.

**20.** Official immunity stands at the crossroads of private and public law and thus requires the reconciliation of two separate legal traditions. For a discussion of the theoritical difficulties inherent in courts' attempts to reconcile these two legal traditions, *see* R. Epstein, *Private Law Models For Official Immunity,* 42 Law & Contemp. Probs. 53 (1978).

courts have recognized that the threat of personal liability may make public officials unduly fearful in exercising their authority and thus discourage them from taking the prompt, decisive action required for the public good.[21] On the other hand, there is a strong public policy of protecting citizens from oppressive and malicious acts.[22] The myriad of cases and commentaries on this subject indicate that whether a court adopts a rule of absolute or qualified immunity has depended primarily on which of these two conflicting policies it deemed worthy of the greater weight. *See* Restatement (Second) of Torts, Ch. 45A Immunities, introductory note at 394–95 (1979) (courts today regard the issue of immunity "not so much in terms of its historical background as in terms of a reasoned approach to the policies involved"). Whichever course is taken, however, most courts have adopted an all or nothing approach: they either recognize a general rule of absolute immunity or a general rule of qualified immunity for all officials for all torts.

As our prior decisions in this area indicate, we are of the opinion that some form of immunity for public officials is necessary simply to insure that government continues to function. Every day, public officials in this state make decisions which may adversely affect hundreds, even thousands, of people. Many of these decisions will be wrong, but "it is not a tort for government to govern." *Dalehite v. United States*, 346 U.S. 15, 57, 73 S.Ct. 956, 979, 97 L.Ed. 1427, 1452 (1953) (Jackson, J., dissenting). Thus, we believe that enlightened public policy must ensure that public officials be free to fulfill their responsibilities with independence, vigor and a wide margin for error. Yet, we also agree with Justice Brennan that in a society as complex as ours, where we have seen burglary, eavesdropping, bribery and perjury committed at the highest levels, that:

> [C]ourts should be wary of any argument based on the fear that subjecting government officers to the nuisance of litigation and the uncertainties of its outcome may put an undue burden on the conduct of the public business. Such a burden is hardly one peculiar to public officers; citizens generally go through life subject to the risk that they may, though in the right, be subject to litigation and the possibilities of a miscarriage of justice ... [Absolute immunity can have] too much of a flavor of throwing out the baby with the bath.

*Barr*, 360 U.S. at 588–89, 79 S.Ct. at 1348–49, 3 L.Ed.2d at 1451 (Brennan, J., dissenting).

Thus, we are not inclined to adopt an all or nothing approach. We perceive no logical or compelling reason why a public official should always be entitled to absolute immunity. Conversely, there are times when a rule of qualified immunity will simply not protect public interests worthy of protection. Consequently, we believe that the best approach is to strike a balance between the public's interest in efficient, unflinching leadership and the interests of maliciously injured parties.

In order to achieve this balance, we need to focus upon the particular circumstances and conduct that give rise to the claim of liability, with careful consideration being given to each of the following factors:

> (1) The nature and importance of the function that the officer performed to the administration of government (i.e. the importance to the public that this function be performed; that it be performed correctly; that it be performed

---

**21.** *See generally* G. Bermann, *Integrating Governmental and Officer Tort Liability*, 77 Colum. L.Rev. 1175, 1178–79 (1977) (hereinafter Bermann, *Officer Tort Liability*); N. Fox, *The King Must Do No Wrong: A Critique of the Current Status of Sovereign and Official Immunity*, 25 Wayne L.Rev. 177, 178–81 (1979) (hereinafter Fox, *No Wrong*); R. Cass, *Damage Suits Against Public Officers*, 129 U.Pa.L.Rev. 1110, 1119–25 (1981).

**22.** As one commentator has noted:

> [W]rongdoing seems worth deterring or punishing whatever that the wrongdoer happens to wear. Moreover, there is something anomalous about denying relief to a tort victim simply because he had the added misfortune of being injured by a public official rather than a private citizen.

Bermann, *Officer Tort Liability*, at 1178.

according to the best judgment of the officer unimpaired by extraneous matters);

(2) The likelihood that the officer will be subjected to frequent accusations of wrongful motives and how easily the officer can defend against these allegations; and

(3) The availability to the injured party of other remedies or other forms of relief (i.e. whether the injured party can obtain some other kind of judicial review of the correctness or validity of the officer's action).

When applying this objective test to the facts of any particular case no one factor is controlling. Any decision must be grounded upon a balanced consideration of all the factors.[23] If, as a matter of law, the court determines that immunity should be absolute, then allegations of improper motive become irrelevant and the case should properly be dismissed under Rule 12(b)(6). If, on the other hand, the court determines that based on these factors that qualified immunity is appropriate, inquiry into motive becomes relevant. In such situations properly pled allegations of malice or corruption should generally be sufficient to withstand a motion to dismiss for failure to state a claim.[24] With this in mind, we turn to the case at bar.

### A

■ The first factor we consider is the nature and importance of the function performed by the defendant to the administration of government.

It is undeniably of great importance that the governor engage in the supervision of his subordinates. The power of unelected administrators and bureaucrats is ever increasing. The governor and lieutenant governor are the only elected members of the executive branch. For the most part, it

is the governor who must heed popular sentiment and public opinion in the making of government policy, since it is the governor who will pay the political price if his or her administration is unresponsive to the people's needs. Thus, while engaged in the supervision of cabinet and sub-cabinet officers, the governor must feel unimpaired to direct them in the way he determines best, since he is ultimately responsible for the actions of those he appoints.

This is particularly true where the state's natural resources are concerned. The importance of Alaska's natural resources to the health and welfare of its people is self-evident. To allow the governor's motives to be questioned at every turn, by every disappointed applicant for a mining lease, or a land grant, or oil rights, would effectively undermine the governor's ability to govern. It is to guard against this possibility that a rule of absolute immunity is designed.

The same is not true, however, for the allegedly defamatory statements made by Sheffield. Undoubtedly, the governor must feel free to speak out on matters of public interest without the apprehension of being unduly constrained or fettered in informing the people of his views. The importance to the public in allowing the governor *carte blanche* to intentionally defame a person or business cannot, however, be said to rise to the same level of importance as the exercise of supervisory authority over the development and exploitation of the state's natural resources.

Moreover, it does not appear that the effective administration of government would be unnecessarily impaired by holding the governor personally liable for intentionally or maliciously defaming citizens. Otherwise stated, holding the governor to a standard of good faith in his public statements more than adequately protects the

---

**23.** Our opinion is limited solely to situations where a plaintiff's common law rights are involved. We express no opinion as to situations where a public official violates clearly established statutory or constitutional rights. *See Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

**24.** Of course, the plaintiff must still prove that the public official's actions were, in fact, done maliciously or corruptly. Moreover, although the existence or absence of malice is generally a question of fact for the jury, when this question has been removed from the case by uncontroverted affidavits and/or depositions, summary judgment may be granted.

public interest in undeterred leadership without exposing the governor to any particularly onerous burdens.

B

The likelihood that the officer will be subjected to frequent accusations and the ease with which the officer can defend against those accusations is the next factor we must consider.

The governor is, without question, the most visible and identifiable political figure in Alaska. Thus, it would seem that the very nature of this high office would make the governor a ready target for numerous lawsuits. History, however, does not bear out this assumption. The present appeal is the first case to reach this court in which the governor has been sued for personal tort liability. Neither party points to any trend, past or present, indicating that governors in general have been the target of a disproportionate number of lawsuits and our own research fails to denote any such phenomena. Furthermore, there is no evidence in the record to suggest that governors in jurisdictions that follow a rule of qualified immunity are any more subject to suit than their counterparts in states where absolute immunity is the rule.

The ease with which the officer can defend against the accusations, however, presents a different problem. The state of mind of a defendant is generally a question of fact for the jury. Thus, in most instances, allowing an inquiry into motive will require that a trial be held. The nature and complexity of such a trial will necessarily affect the public official's ability to meet the accusation of wrongful motive. The crucial inquiry for us then, is whether allowing an examination into motive would be more costly to the public good than the possibility of actual malice or wrongful motive on the part of the public official.

As to Aspen's four claims of wrongful interference we believe that it would. If

inquiry into Governor Sheffield's motives in ordering the rejection of Aspen's permit applications were allowed, it is a near certainty that Governor Sheffield would have to testify, and probably a host of other public officials as well. Moreover, the complexity of Aspen's wrongful interference claims would undoubtedly require a lengthy trial, with a high likelihood that the court and jury would be asked to review what were essentially policy determinations for the executive branch. We perceive no good reason for requiring a governor to defend in a public trial his motivations for acts of the sort alleged here. To hold otherwise would subject every decision of a public official to post-hoc scrutiny by lay persons often not versed in the ways of government.

Inquiry into Governor Sheffield's alleged defamatory statements, on the other hand, presents no such problem; the issues in such a case are rather limited, so that the trial should not be excessively complex or lengthy. Thus, a rule of absolute privilege as to this cause of action would do little more than protect unprivileged defamatory statements, leaving a maliciously injured plaintiff without a remedy. A rule of qualified immunity, on the other hand, provides protection to both the honest or mistaken public official and the party injured by unprivileged defamatory statements.

C

The final factor we take into consideration is the availability of other remedies or other forms of relief. Where there is an adequate alternative remedy the need for common law tort liability as a remedy is reduced.

As to the rejection of Aspen's permits, an alternative remedy is readily available. As Aspen is well aware, a decision by the Commissioner of the DNR[25] granting or denying of offshore prospecting permit applications is "a final administrative order,"

**25.** The actual rejection of Aspen's permit applications was done by the Commissioner pursuant to a February 8, 1985 Commissioner's Decision on the Issuance of Offshore Prospecting Permits in Cook Inlet. In this decision, the Commis-

sioner rejected *all* permit applications in Cook Inlet based on her finding that there was inadequate information to make a best interests determination.

subject to review by means of an administrative appeal to the superior court. *See* AS 44.62.560. In fact, Aspen availed itself of this remedy, even before filing the present suit.[26] The availability of this alternative weighs heavily in favor of granting absolute immunity, a conclusion bolstered by the fact that Aspen had no vested right to receipt of any permit in the first place.[27] At most, Aspen was entitled to a fair determination of their permit applications. Any wrongdoing that may have occurred during the course of this determination, we believe, is adequately redressed through the administrative appeals process.

No such alternative exists, however, for harm caused by the defendant's allegedly defamatory statements. The only means Aspen has to vindicate its rights is prosecution of this suit. To adopt a rule of absolute immunity would, therefore, leave Aspen without a remedy.

Were we to adopt a rule of absolute immunity for defamatory statements made by public officials, we would, in effect, sanction the ability of those officials to libel or slander at will. We believe that this possibility poses a much more serious danger than the possibility that an official might occasionally be called upon to defend his or her actions and respond in damages for a malicious defamation.

In sum, applying the balancing test we adopt today, we hold that Governor Sheffield is entitled to absolute immunity for the four alleged wrongful interference torts arising out of his order that Aspen's permit applications be rejected. However, we further hold that Governor Sheffield is only entitled to qualified immunity for his allegedly defamatory statements.[28] Under a rule of qualified immunity, Aspen's allegation of defamation should not have been dismissed. Thus, the trial court's judgment on this issue must be reversed.[29]

## V

The trial court awarded Sheffield $12,232 in attorney's fees. This was approximately 80% of the fees actually incurred. Aspen contends that this award is erroneous.

Because the trial court erred in dismissing Aspen's claim of damages for defamation, its award of attorney's fees must be vacated pending resolution of this issue. We, of course, express no opinion at this time on the merits of this issue.

## VI

For the reasons set forth above, the trial court's judgment is AFFIRMED in part, REVERSED in part and REMANDED for further proceedings not inconsistent with this opinion.

---

26. Aspen appealed the Commissioner's decision rejecting all permits in Cook Inlet to the superior court in March of 1985. We take judicial notice that since that time, the permit application decision has been remanded back to the DNR for redetermination. The current status of the DNR's redetermination is unknown.

27. AS 38.05.250 provides that the right to prospect for minerals in tide or submerged lands *may* be granted by permit. This statute is clearly permissive rather than mandatory in nature and in no way requires the state to grant such privileges. Moreover, when and if the state determines that such permits should be granted they can only be granted "in the best interests of the state." AS 38.05.035(e). With no vested right or interest in the permit, Aspen cannot complain of the deprivation of any substantive property right.

28. This rule is limited only to public statements made by public officials. Internal governmen-

tal communications remain subject to the general rule.

29. Sheffield's argument that he is entitled to immunity under AS 09.50.250(3) is totally without merit. That statute applies only to claims against the state. It provides no immunity for public officials. *See Earthmovers,* 691 P.2d at 285 (Rabinowitz, J., concurring); *Bone v. Andrus,* 527 P.2d 783, 785 (Idaho 1974) (sovereign immunity immunizes the state as opposed to individuals); *Bradshaw v. Prince George's County,* 284 Md. 294, 396 A.2d 255, 261 (1979) ("immunity of such officers ... rests upon wholly different grounds from that of the State" (quoting *Eliason v. Funk,* 233 Md. 351, 196 A.2d 887 (1964))). *See generally* 63A Am.Jur.2d, § 359 at 925–26; Prosser, § 132. There is also no merit to Sheffield's argument that the separation of powers doctrine mandates absolute immunity.